UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


CHECKPOINT FLUIDIC SYSTEMS                    CIVIL ACTION
INTERNATIONAL, LTD.


VERSUS                                        NO: 10-4505


RAY GUCCIONE, SR., ET AL.                     SECTION: R(1)



<u>**ORDER AND REASONS**</u>

Before the Court is RAM Repairs, LLC and Ray Guccione's
motion for partial summary judgment.  Because there are no
genuine issues of material fact concerning plaintiff's claims for
trademark infringement and dilution under the Lanham Act and
Louisiana law, the Court GRANTS the defendants' motion, in part.
Because there are genuine issues of material fact as to
plaintiff's claims for violations of Louisiana's Trade Secret Act
and Guccione's alleged contract breaches, the Court DENIES
summary judgment on those claims.


**I.    BACKGROUND**

This trademark infringement, false advertising and unfair
competition case arises out a dispute between plaintiff

CheckPoint Fluidic Systems and defendants Ray Guccione and RAM Repairs LLC.  CheckPoint is a Texas limited partnership that designs, manufactures and sells chemical injection pumps and pump components.  Guccione was formerly the vice president and twenty percent owner of Cross Pump International, Inc., a company that designed chemical injection pumps.[1]  On October 18, 1993, Cross Pump executed a sales agreement with Elliott/Ellis Enterprises, Inc. ("EEI"), in which it transferred to EEI its physical inventory, all of the patents it owned or was developing, and exclusive rights to its intellectual property.[2]  Specifically, EEI obtained through the Sales Contract:

> the sole, exclusive, and irrevocable worldwide right to develop, manufacture, market, sell, assign, license and/or distribute products, patents, and/or designs referred to or based on [any and all patents currently owned by Cross Pump and Cross Pump's physical inventory]..., and any and all future designs and/or products [Cross Pump] may develop from time to time related to products, patents, and/or designs referred to or based on [Cross Pump's patents and physical inventory].[3]

EEI also purchased "[t]he complete and irrevocable right of first refusal to review and/or acquire any intellectual property developed by [Cross Pump]."[4]  The Sales Contract included a

---

[1]    R. Doc. 160-2 at 19; 160-7 at 14.

[2]    R. Doc. 137-4.

[3]    *Id.* at 6.

[4]    *Id.* at 8.

"Patent, Trademark & Trade Secrets Assignment" ("Assignment Agreement"),[5] as well as a "Confidentiality and Non-Competition Agreement" between EEI and Guccione ("Confidentiality Agreement").[6] EEI paid Cross Pump $15,000 for its goodwill,[7] and $22,000 for its patents, intellectual property and inventory.[8] EEI also agreed to pay royalties to Cross Pump for 99 years in the amount of three percent of the domestic revenues and one percent of the international revenues generated by the assets transferred in the sale.[9] CheckPoint asserts that although improvements have been made to the pumps listed in the Sales Contract, CheckPoint's Series 1250 and Series 1500 chemical injection pumps are based on pumps listed in the Sales Contract.[10]

CheckPoint represents that EEI assigned CheckPoint its rights under the Sales Contract when the CheckPoint limited partnership was formed on November 1, 1993. Under the terms of the Sales Contract, EEI could not assign all of the Cross Pumps

---

[5]     R. Doc. 160-2 at 20-32.

[6]     R. Doc. 137-5.

[7]     A portion of the goodwill payment was made as a pre-payment on July 19, 1993. See R. Doc. 160-2 at 11.

[8]     R. Doc. 160-2 at 11.

[9]     *Id.* at 12.

[10]    *Id.* at 2.

3

assets without obtaining Cross Pump's permission.[11] But, the agreement allowed EEI to form another entity to carry out the Sales Contract as long as it maintained control of a majority of the equity interest in that entity.[12] EEI obtained a majority interest in CheckPoint of 70%.[13] CheckPoint asserts that it paid $35,000 for the assignment from EEI and that it assumed the royalty obligation to Cross Pump as part of the deal.

Guccione became an employee and limited partner of CheckPoint in November 1993. CheckPoint alleges that in this role, Guccione had access to valuable proprietary information. In his declaration, CheckPoint's CEO, Andrew Elliott, asserted that CheckPoint consistently took steps to maintain the confidentiality of its proprietary information, including limiting access to such information, requiring confidentiality agreements before disclosing sensitive information, and adopting company policies that required log-in information and passwords before accessing design drawings.[14] Guccione's employment with CheckPoint ended on December 15, 2005, but he continues to be a limited partner in CheckPoint.

After leaving CheckPoint, Guccione became the managing

---

[11]   R. Doc. 189-6 at 18.

[12]   *Id.* at 8.

[13]   *Id.* at 45, 52.

[14]   R. Doc. 160-2 at 2.

partner and a thirty-six percent owner of RAM, a company that manufactures chemical injection pumps called "Monkey Pumps". Guccione formed RAM along with Gemelli Investments, Inc., owned by Richard Ellis,[15] Richard Ellis's brother, David, and employees of Gly-Tech Services, Inc., a CheckPoint customer.  RAM initially acted as a third-party repair business for pumps.[16]  In July 2009, RAM began selling its own pumps.[17]  CheckPoint complains that RAM and Guccione designed the Monkey Pumps through the use of Checkpoint's confidential and proprietary information and trade secrets. Defendants contend that they developed Monkey Pumps independently with their contractor Dyn-O-Mach Inc. ("Dyn-O-Mach"), a manufacturing company.

Checkpoint had already engaged Dyn-O-Mach to produce CheckPoint pump parts. As part of that process, CheckPoint provided Dyn-O-Mach with detailed manufacturing drawings of its pump parts.[18]  CheckPoint asserts that Guccione knew of the relationship between CheckPoint and Dyn-O-Mach because Guccione regularly called Dyn-O-Mach regarding parts orders when he was a

---

[15]    Richard Ellis founded EEI and CheckPoint with Andrew Elliott in 1993 and sold his interest in EEI in 2003.

[16]    R. Doc. 160-7 at 11.

[17]    Guccione Deposition (Exhibit A), p. 129.

[18]    Olano Deposition (Exhibit D), p. 139-40.

Checkpoint employee.[19]

In 2008, the patents on CheckPoint's Series 1250 and 1500 pumps expired.[20]  In February 2008, Guccione hired Ha Tran Quach to make drawings of these CheckPoint pumps.[21]  Quach finished the last drawings in June 2008.[22]  At some point after June 2008, Dyn-O-Mach agreed to reverse engineer the components for one of the CheckPoint pumps for Guccione.[23]  In exchange, Dyn-O-Mach became the exclusive manufacturer of those parts.[24]

To facilitate the reverse engineering process, Guccione provided Dyn-O-Mach with drawings of the pumps made by Quach, as well as other drawings of unknown origin, and spare CheckPoint parts.[25]  Guccione was "actively involved"[26] in the reverse engineering process.  Guccione approved and revised the drawings as Dyn-O-Mach created them and provided Dyn-O-Mach with the

-------

[19]    R. Doc. 160-7 at 19.

[20]    R. Doc. 151-7 at 13-14.

[21]    R. Doc. 160-7 at 29.

[22]    *Id.* at 33.

[23]    R. Doc. 160-7 at 18.

[24]    *Id.* at 53.

[25]    R. Doc. 176-9 at 54.

[26]    Guccione Deposition (Exhibit A), p. 126.

tolerances for the measurements of the parts.[27,28]

Michael Olano, the owner of Dyn-O-Mach, testified that the process of creating all of the drawings from CheckPoint pump parts took about one and a half to two years.[29]  Guccione testified that he brought the first box of parts to Dyn-O-Mach several months after Quach finished the drawings in June 2008.[30] RAM first began selling Monkey Pumps sometime around July 2009.[31]

On December 9, 2010, CheckPoint sued Guccione and RAM for violations of the Lanham Act, trademark infringement and dilution, and false advertising.[32]  Plaintiff also asserted violations of the Louisiana Uniform Trade Secrets Act ("LUTSA"), the Louisiana Unfair Trade Practice and Consumer Protection Act ("LUTPA"), state law trademark infringement, breach of fiduciary duty, and breach of contract.

Defendants Guccione and RAM now move for partial summary judgment.  They argue that (1) plaintiff's trademark claims under

---

[27]    Guccione Deposition (Exhibit A), p. 160.

[28]    A tolerance is a determination of how far a manufactured part can vary from the design drawing measurements before that part is considered defective.

[29]    R. Doc. 176-9 at 10-11.

[30]    Guccione Deposition (Exhibit A), p. 145.

[31]    *Id.* at 129.

[32]    R. Doc. 1.

the Lanham Act and Louisiana law should be dismissed because the trademarks for CheckPoint Pumps and Monkey Pumps are completely distinct and there is no evidence of dilution; (2) CheckPoint has no evidence that defendants violated LUTSA; (3) the 1993 Non-Competition Agreement expired and CheckPoint has not demonstrated that Guccione breached the confidentiality provision of the agreement; and (4) the 1993 Assignment Agreement did not foreclose Guccione from making Monkey Pumps. In response, plaintiff argues that the motion is premature because discovery is ongoing and urges the Court to deny the motion pursuant to Federal Rules of Civil Procedure 56(d). CheckPoint also opposes the motion on the merits. Because CheckPoint responded substantively and has not shown that particular facts essential to its opposition are unavailable, a continuance or deferral under Fed. R. Civ Pro. 56(d) is not warranted. The Court resolves the motion as follows.

## II.   STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477

8

U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991).  The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party

9

will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith ex rel. Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).


**III. DISCUSSION**

   *A. Trademark Claims*

   <u>1. Trademark Infringement</u>

   The Lanham Act provides a cause of action for trademark infringement against a person who "uses (1) any reproduction, counterfeit, copy[,] or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution[,] or advertising of any goods; (5) where such use is likely to cause confusion, or to cause mistake or to deceive." *American Rice,*

*Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).

Defendants argue that plaintiff's claim of trademark infringement must fail because the CheckPoint trademark and the Monkey Pump are visually distinct, and therefore no likelihood of confusion is possible.  CheckPoint responds that its claim of trademark infringement is not based upon the similarity of the marks.  Rather, CheckPoint contends that RAM and Guccione used CheckPoint's trademarked name to make customers think that RAM and Monkey Pumps are associated with CheckPoint and to confuse customers as to the source and origin of RAM's parts and pumps.

The most important question in a trademark infringement action "is whether one mark is likely to cause confusion with another." *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009) (citing *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir.1985)).  The Fifth Circuit relies on a nonexhaustive list of "digits of confusion" to determine whether this likelihood of confusion exists: (1) type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers.  *Xtreme Lashes,* 576 F.3d

at 227 (citing *Marathon*, 767 F.2d at 217).  The likelihood of confusion is typically a question of fact, but "summary judgment is proper if the 'record compels the conclusion that the movant is entitled to judgment as a matter of law.'"  *Xtreme Lashes*, 576 F.3d at 227 (quoting *Bd. of Supervisors for La. State Univ. Agric. & Mech. College v. Smack Apparel*, 550 F.3d 465, 474 (5th Cir. 2008).  Generally, no single "digit" is treated as dispositive of the existence of a likelihood of confusion.  *Conan Props., Inc. v. Conans Pizza*, Inc., 752 F.2d 145, 150 (5th Cir. 1985) (citing *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1159 (5th Cir. 1983)).  But, "[t]he two marks must bear some threshold resemblance to trigger inquiry into extrinsic factors".  *Xtreme Lashes*, 576 F.3d at 228 (quoting *Sun-Fun Products, Inc. v. Suntan Research & Development, Inc.*, 656 F.2d at 189).

Mark similarity "is determined by comparing the marks' appearance, sound, and meaning."  *Elvis Presley Enters.*, 141 F.3d at 201. "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features."  *Amstar*, 615 F.2d at 260-61 (quotation omitted).  The CheckPoint trademark consists of the word "CheckPoint" below a geometric design that forms the letters "C"

and "P".  The Monkey Pump mark consists of an abstract monkey.




Neither the appearance, sound, nor meaning of the marks are at all similar.  Indeed, the plaintiff concedes this fact. Accordingly, the Court finds that the marks are so dissimilar as to require summary judgment for the defendants on this claim.

The requirements for trademark infringement under Louisiana law mirror those of the Lanham Act.  *See* La. Rev. Stat. § 51:211 *et seq.* (trademark infringement); *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 343 n. 6 (5th Cir. 1984) ("likelihood of confusion is required explicitly by the Louisiana trademark statute"); *Prudhomme v. Proctor & Gamble Co.*, 800 F.Supp. 390, 396 (E.D.La. 1992)(finding that "because plaintiffs...satisfied the Lanham Act requirements, their complaint withstands dismissal under these state claims as well.").  Accordingly, the Court also grants summary judgment for the defendants on plaintiff's state law trademark infringement claim.

13

<u>2. Trademark Dilution</u>

Defendants also contend that CheckPoint has not presented evidence that defendants have diluted CheckPoint's trademark by tarnishment or blurring. "Trademark dilution is the weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product." *Scott Fetzer Co.*, 381 F.3d at 489.  Under the Lanham Act, "the owner of a famous mark that is distinctive...shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark[.]" 15 U.S.C. § 1125(c)(1).  "Blurring involves a diminution in the uniqueness or individuality of a mark because of its use on unrelated goods." *Scott Fetzer Co.*, 381 F.3d at 489.  "Tarnishing occurs when a trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Id*. (internal quotation marks and citations omitted).  To prevail on a claim of dilution, CheckPoint must prove that (1) its marks are famous and distinctive; (2) RAM adopted its mark after CheckPoint's had

14

become famous and distinctive; and (3) RAM caused dilution of CheckPoint's mark.  *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 669-670  (5th Cir. 2000).

Plaintiff has failed to identify specific facts that establish a genuine issue for trial.  Indeed, plaintiff did not present evidence to establish any of the three elements of a dilution claim.  Accordingly, summary judgment is warranted. *See, e.g, Firefly Digital Inc. v. Google Inc.*, 817 F.Supp.2d 846, 867 (W.D. La. 2011) (granting summary judgment on plaintiff's federal trademark dilution claim because the marks did not meet the requirement of wide recognition by the general public).

B.  *Violations of LUTSA*

LUTSA permits a complainant to recover damages for actual loss caused by the misappropriation of a trade secret.  *See* La. Rev. Stat. § 51:1431.  In order to recover damages under LUTSA, a complainant must prove (1) the existence of a trade secret; (2) the misappropriation of the trade secret by another; and (3) actual loss caused by the misappropriation.  *See* La. Rev. Stat. § 51:1431; *Computer Mgmt Assistance Co. v. DeCastro, Inc.*, 220 F.3d 396, 403 (5th Cir. 2000).

The threshold determination under LUTSA is whether something

constitutes a trade secret.  The statute defines a "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
> (b) is the subject of efforts that are reasonable under the circumstances to maintain secrecy.

La. Rev. Stat. § 51:1431(4).  Whether something is a trade secret is a question of fact.  *See Pontchartrain Med. Labs., Inc. v. Roche Biomedical Labs., Inc.*, 677 So.2d 1086, 1091 (La. Ct. App. 1996); *United Group of Nat'l Paper Distribs., Inc. v. Vinson*, 666 So.2d 1338, 1344 (La. Ct. App. 1996).  "'The efforts required to maintain secrecy are those reasonable under the circumstances, and courts do not require extreme and unduly expensive procedures to be taken to protect trade secrets.' " *Sheets v. Yamaha Motors Corp., U.S.A.*, 849 F.2d 179, 183 (5th Cir. 1988) (quoting *Tubular Threading, Inc. v. Scandaliato*, 443 So.2d 712, 714 (La. Ct. App. 1983)).

Defendants contend that RAM independently designed Monkey Pumps without using CheckPoint's design information and that CheckPoint has put forth no evidence of any type of trade secret that RAM misappropriated. The Court finds that CheckPoint has

16

presented sufficient evidence to create a genuine issue of fact as to whether its design drawings and the information contained on them are trade secrets. In his declarations, CheckPoint CEO Elliott stated that the specifications on the CheckPoint drawings, which reflect extensive work by CheckPoint to refine its pumps parts, are not generally known, and if disclosed would allow another company to produce the pumps without the expensive process of reverse engineering.[33] Eliott also stated that CheckPoint's tolerances, calculations of the permissible variations from the design drawings, are one such specification that cannot be determined from a single part, are generally unknown, and greatly help to create the device.[34]

Further, CheckPoint has presented evidence that the company made reasonable efforts to maintain the secrecy of the drawings. In his declaration, Elliott stated that CheckPoint required employees to sign a confidentiality agreement as a condition of employment, to password protect certain confidential and proprietary information, and limit access to those passwords, and to require confidentiality agreements before disclosing

---

[33]   R. Doc. 160-2 at 2.

[34]   Elliott Declaration (Exhibit G), p. 2.

drawings.[35] Thus, CheckPoint has raised an issue of material fact
as to whether its design drawings, including tolerances, fall
within the definition of a trade secret under LUTSA. *See, e.g.,
Rattler Tools, Inc. v. Bilco Tools, Inc.*, 2007 WL 2008504, at *28
(E.D. La. Jul. 6, 2007) (holding that drawings and specifications
for company's tools were trade secrets).

The next element of a LUTSA claim is misappropriation.
"Misappropriation" means

> (a) acquisition of a trade secret of another by a
> person who knows or has reason to know that the trade
> secret was acquired by improper means or disclosure; or
> (b) disclosure or use of a trade secret of another
> without express or implied consent by a person who:
>> (i) used improper means to acquire knowledge of
>> the trade secret; or
>> (ii) at the time of disclosure or use, knew or had
>> reason to know that his knowledge of the trade
>> secret was:
>>> (aa) derived from or through a person who had
>>> utilized improper means to acquire it;
>>> (bb) acquired under circumstances giving rise
>>> to a duty to maintain its secrecy or limit
>>> its use; or
>>> (cc) derived from or through a person who
>>> owed a duty to the person seeking relief to
>>> maintain its secrecy or limit its use...

La. Rev. Stat. § 51:1431. CheckPoint asserts that Guccione
directly misappropriated its trade secrets in the form of
drawings and part tolerances. Guccione provided Dyn-O-Mach with

---

[35]   R. Doc. 160-2 at 2.

Quach's drawings along with other drawings from an undisclosed source.  CheckPoint asserts that those other drawings were CheckPoint drawings, and urges that this was misappropriation. In the absence of any evidence that those other drawings were indeed CheckPoint drawings, this assertion does not create an issue of fact on the claim of misappropriation.

CheckPoint also contends that Guccione provided Dyn-O-Mach with CheckPoint's tolerances for the creation of Monkey Pumps. Guccione testified that he did not know CheckPoint's tolerances and therefore could not have given them to Dyn-O-Mach.[36] He testified that he used his general knowledge as a machinist and collaborated with Dyn-O-Mach's Mike Olano to generate the Monkey Pump tolerances.[37]  Olano testified that Guccione informed Dyn-O-Mach that the tolerances Dyn-O-Mach had originally selected could be loosened, allowing the parts to be made less precisely.[38] When asked during his deposition whether Dyn-O-Mach ever consulted the CheckPoint drawings and relayed the CheckPoint tolerances to Guccione, Olano responded, "I think he already knew what the

---

[36]    Guccione Deposition (Exhibit A), p. 159.

[37]    *Id.* at 160.

[38]    Olano Deposition (Exhibit D), p. 239-40.

tolerances were."[39] CheckPoint has also submitted two expert reports, one of which stated that since a part's tolerance cannot be obtained by measuring the part, findings that CheckPoint and RAM tolerances were the same suggest that CheckPoint specifications were used to create Monkey Pumps.[40] This circumstantial evidence is sufficient to create an inference that Guccione used CheckPoint's tolerances and thus creates an issue of fact as to whether defendants misappropriated CheckPoint's trade secret.

In addition, CheckPoint contends that defendants violated LUTSA through Dyn-O-Mach's use of CheckPoint's trade secrets in RAM products, because defendants knew or had reason to know that the misappropriation was occurring and benefitted from Dyn-O-Mach's actions. Under LUTSA, misappropriation occurs through the:

> Disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

La. Rev. Stat. § 51:1431. In *Metallurgical Indus. Inc. v.*

---

[39]    Olano Deposition (Exhibit D), p. 240.

[40]    R. Doc. 194-10.

*Fourtek*, the Fifth Circuit analyzed trade secret liability under a similar provision, Restatement of Torts § 757.[41] In that case, the defendant hired Fourtek, a company composed of individuals who had worked for a manufacturing company that constructed furnaces for the plaintiff. 709 F.2d 1195 (5th Cir. 1986). Plaintiff had made extensive modifications to the furnaces and claimed the modifications as trade secrets. *Id.* at 1198. Fourtek created furnaces for the defendant that used these allegedly protected modifications. *Id.* The Court held that the defendant could be liable for Fourtek's incorporation of trade secrets into defendant's product, since the company knew of the trade secret dispute, *if* the defendant was found to have "used" the trade secrets. *Id.* at 1204-05. In defining "use", the Court determined that the use must be "commercial use" and that placing the product incorporating a trade secret into operation qualified as commercial use. *Id.* at 1205. Under La. Rev. Stat. § 51:1431 and *Fourtek*, defendants would be liable: (1) if they knew that Dyn-O-Mach was using CheckPoint trade secrets in the production of RAM

---

[41]   Restatement § 757 states, "One who discloses or uses another's trade secret, without privilege to do so, is liable to the other if . . . he learned the secret from a third person with notice of the facts that it was a secret and that the third person's disclosure of it was otherwise a breach of his duty to the other."

products and (2) if defendants made commercial use of the trade secret.

Here, CheckPoint presented evidence that defendants knew Dyn-O-Mach used CheckPoint proprietary materials and had a duty not to do so. Guccione instructed Dyn-O-Mach not to "use any of CheckPoint's stuff,"[42] indicating an awareness of the potentiality for misuse of CheckPoint's materials. Guccione contends that this statement demonstrates his lack of knowledge of Dyn-O-Mach's actions; nevertheless, Guccione testified that he knew that Dyn-O-Mach made pumps for CheckPoint when he hired them to reverse engineer the CheckPoint pumps, and thus knew that Dyn-O-Mach possessed CheckPoint's design drawings.[43] As further evidence of defendants' knowledge of Dyn-O-Mach's alleged misappropriation, CheckPoint points out that RAM sold Monkey Pumps in July of 2009, but Olano testified that Dyn-O-Mach took up to two years to finalize all of the part drawings and did not begin the process until sometime after June 2008.[44] In addition, Olano testified that Dyn-O-Mach sent emails and invoices to RAM

---

[42]   Guccione Deposition (Exhibit A), p. 155.

[43]   *Id.* at 123-24.

[44]   Olano Deposition (Exhibit D), p. 112-13.

and Guccione in connection with Monkey Pumps that referred to CheckPoint's drawings and part numbers.[45] He further testified that Guccione told him to change the invoices because he did not want CheckPoint's information referenced.[46] That Guccione denied ever reviewing invoices from Dyn-O-Mach[47] only creates a factual dispute on this issue. Accordingly, the Court finds that the foregoing evidence, taken together, is sufficient to create an issue of material fact as to whether the defendants knew or had reason to know that Dyn-O-Mach had misappropriated CheckPoint's trade secrets in the manufacturing of RAM products.

Next, CheckPoint has produced evidence that defendants "used" its trade secrets. It is undisputed that defendants sold Monkey Pumps in July of 2009. Marketing and selling products that were made using the trade secrets of another constitutes "commercial use" of the trade secret. *See Fourtek*, 709 F.2d at 1205 (stating that commercial use should be given the "everyday meaning of the term"). Therefore, CheckPoint has produced sufficient evidence to defeat summary judgment on its claim that

---

[45]   Olano Deposition (Exhibit D), p. 92-92.

[46]   *Id.*

[47]   Guccione Deposition (Exhibit A), p. 184.

23

RAM violated LUTSA by knowingly availing itself of CheckPoint's trade secrets through Dyn-O-Mach.

*C. Breach of Contract Claims*

CheckPoint asserts violations of the Confidentiality Agreement and the Assignment Agreement that Guccione signed in 1993 as part of Cross Pump's sale of its assets to EEI. In the context of this motion, Guccione does not dispute CheckPoint's standing to enforce the two agreements. Rather, Guccione contends that there is no evidence that he breached the Confidentiality Agreement and that the Assignment Agreement does not prohibit him from manufacturing Monkey Pumps.[48]

<u>1. Confidentiality and Non-Competition Agreement</u>

Guccione does not contest the terms of the Confidentiality Agreement and instead denies any use of CheckPoint's proprietary information. Under the Confidentiality Agreement, Guccione agreed to:

> (i) treat as confidential any Proprietary Information which has been or may hereafter be made available by the Company to the Recipient; (ii) treat as

---

[48]     Defendants also claim that the non-competition provision of the Confidentiality Agreement has expired; however, because CheckPoint does not assert a claim for breach of the non-compete clause, the issue is not before the Court.

confidential all Proprietary Information which was
available to the Recipient before being acquired by the
Company but which is now proprietary to the Company;
(iii) not disclose any such Proprietary Information,
except to such third parties as may be specifically
designated by the Company in writing as authorized to
receive the same; and (iv) not use such Proprietary
Information for any purpose other than as authorized in
writing by the Company.[49]

"Proprietary Information" is defined as
    any and all property as defined within the terms
    "Assets" and "Patent Estate" in the Sales Contract...
    any and all drawings, specifications, field interviews,
    test results, communications, customer and vendor
    lists, sales figures, promotional materials, and any
    and all other materials relating to said Assets and the
    Patent Estate which may be generated by the Company at
    any time in the future, and any and all other knowledge
    or data of any sort, in whatever form, which is
    possessed by the Company and disclosed or delivered in
    any way to the Recipient which relates, directly or
    indirectly, to the business or products of the Company
    or the technology being used, developed, or exploited
    in any way by the Company or which the Company may use
    or develop in the future.[50]

CheckPoint asserts that Guccione violated this agreement by (1)

providing CheckPoint tolerances and drawings to Dyn-O-Mach in

connection with its production of Monkey Pumps, (2) taking a

black book with customer contacts when he left CheckPoint, and

(3) using CheckPoint's proprietary information related to

customers, vendors and pricing.

---

[49]    R. Doc. 137-5 at 1-2.

[50]    *Id.* at 1.

CheckPoint has submitted no evidence to support its assertion that Guccione provided CheckPoint drawings to Dyn-O-Mach or used CheckPoint's pricing information. CheckPoint does, however, put forth evidence sufficient to create issues of material fact as to whether Guccione used proprietary customer and vendor contact lists. The Confidentiality Agreement specifically identifies customer and vendor lists as a type of proprietary information.[51] Guccione testified that his "black book", which he kept when he left CheckPoint, "could have" contained customer contacts that he developed while at CheckPoint and that he "could have" used those contacts after he left CheckPoint.[52] In his declaration, Elliott states that the book contained the contact information for at least 70 CheckPoint customers and 45 CheckPoint vendors.[53] The Court finds that whether Guccione used CheckPoint's proprietary contact and vendor information is a disputed issue of material fact.

Further, as previously discussed, there is circumstantial evidence that Guccione provided Dyn-O-Mach with CheckPoint's

---

[51]    R. Doc. 137-5 at 1 ("'Proprietary information' is defined as . . . customer and vendor lists.")

[52]    Guccione Deposition (Exhibit A), p. 79-80.

[53]    Elliott Declaration (Exhibit B), p. 5.

tolerances in connection with Dyn-O-Mach's work on Monkey Pumps.
The tolerances fall within the definition of proprietary
information under the contract as a design specification of the
pumps.[54] Whether the tolerances that Guccione gave to Dyn-O-Mach
were CheckPoint's tolerances remains in dispute. This factual
issue and Guccione's alleged use of CheckPoint's contact and
vendor lists are sufficient to preclude summary judgment on
plaintiff's claim for breach of the Confidentiality Agreement.

### 2. Breach of the Assignment Agreement

Defendants also attack CheckPoint's claim that Guccione
violated the Assignment Agreement that accompanied the 1993 Sales
Contract by manufacturing pumps "based on" the designs that Cross
Pump assigned to EEI. Defendants argue that the terms of the
Assignment Agreement do not prevent Guccione from reverse
engineering CheckPoint pumps

Under the Assignment Agreement, Cross Pump assigned EEI
specific patents, patent applications, intellectual property,
trade secrets developed by Cross Pump and the "Inventors"
(including Guccione), and the trademark and trade name Cross

---

[54]   R. Doc. 137-5 at 1 ("'Proprietary information' is
defined as . . . any and all drawings, specifications ...").

Pump.[55] Guccione signed the agreement individually as an inventor and on behalf of Cross Pump as an officer in the company. Cross Pump and the inventors assigned to EEI "the sole, exclusive, and irrevocable worldwide right to develop, manufacture, market, sell, assign, license and/or distribute products, patents, and/or designs referred to or **based on** Section 2 of the Sales Contract"[56] (emphasis added). Section 2 of the Sales Contract lists, among other materials, Cross Pump's designs, patents, and products, including Chemical Injection Pumps CP-1250 and CP-2200.[57] CheckPoint contends that Monkey Pumps are "based on" these two pumps, which have evolved into CheckPoint's Series 1250 and 1500 pumps; consequently, CheckPoint argues that Guccione is barred from creating pumps with CheckPoint's designs, even through the otherwise legal activity of reverse engineering.

Defendants contend the 1993 Confidentiality Agreement contemplated that Guccione would be entitled to make pumps that competed with CheckPoint's products in the future. They rely on the provision of the agreement that prohibited Guccione from

---

[55]    R. Doc. 160-2 at 20-22.

[56]    *Id.* at 24.

[57]    R. Doc. 137-4 at 2.

28

competing with CheckPoint or manufacturing "any product[s]
**similar to** that which is identified in the Proprietary
Information"(emphasis added) for a period of five (5) years after
the agreement was signed.[58]  Since five years had elapsed by
1998, defendants argue that Guccione was free to manufacture
pumps similar to CheckPoint's. Defendants also allege that
prohibitions on manufacturing "similar" pumps and pumps "based
on" CheckPoint products are fundamentally equivalent, and
therefore, CheckPoint's claim for breach of the Assignment
Agreement is an attempt to extend the expired Non-Competition
Agreement indefinitely.[59] CheckPoint argues that the terms
"similar to" and "based on" have different meanings, and thus the
two contracts do not conflict. The parties' contentions require
the Court to construe the terms of the two agreements.

Under Louisiana law, the words of a contract must be given
their generally prevailing meaning.  La. Civ. Code art. 2047.
When a contract is clear and explicit, no further interpretation
may be made in search of the parties' intent.  La. Civ. Code art.
2046.  The issue of ambiguity of a contract is a legal question.

---

[58]    R. Doc. 137-5 at 2.

[59]    R. Doc. 137-1 at 16.

29

*Dore Energy Corp. v. Prospective Inv. & Trading Co., Ltd.*, 570
F.3d 219, 225 (5th Cir. 2009) (discussing the principles
governing the interpretation of contracts under Louisiana law).
If the contract is not ambiguous, interpreting it is also a legal
issue for the court. *Dore Energy Corp.*, 570 F.3d at 225. A court
may consider extrinsic evidence as to the parties' intent only if
the contract is ambiguous. *See, e.g., Campbell v. Melton*, 817 So.
2d 69, 75 (La. 2002).

In interpreting the Confidentiality Agreement and the
Assignment Agreement, the Court finds that the terms "based on"
and "similar to" in the context presented are vague and
ambiguous. First, both terms are subject to more than one
reasonable interpretation. Webster's Dictionary defines "based
[on]" as "having as its basis," and defines "basis" as "the base,
foundation, or chief supporting factor of anything; the principal
constituent of anything; the fundamental principle or theory".
*Webster's New World College Dictionary* (Michael Agnes ed., 4th
ed. 1999). "Similar" is defined as "nearly but not exactly the
same or alike" or as "having a resemblance". *Id.* If "based on"
means having the same "fundamental principle or theory" and
"similar to" means "nearly but not exactly the same," it is
difficult to conceive how a pump could be a "similar" pump

30

without sharing the same "fundamental principle or theory". On the other hand, if "similar to" simply means resembling and "based on" means having the same "base" or "foundation," a product could be similar to another product without being based on it. "Based on" in that sense could require one to have been made with reference to the other. Second, the complexity of the pumps and the contracts in question increases the ambiguity of the terms, because it is not clear on this record whether "similar to" and "based on" are terms of art with particular meanings within the field of pump design and manufacturing.

CheckPoint has demonstrated that if "similar to" and "based on" are construed to have different meanings, the Confidentiality Agreement and the Assignment Agreement do not necessarily conflict, and CheckPoint may bring a claim against Guccione for breach of the Assignment Agreement. Given the ambiguity of the terms, evidence of the parties' intent in forming the agreements may be presented at trial. Therefore, because questions of material fact remain as to the scope of the contract terms, defendants' motion for summary judgment on the breach of the Assignment Agreement claim is denied.

**IV.  CONCLUSION**

31

For the foregoing reasons, the Court GRANTS, in part, and
DENIES, in part, defendants' motion for partial summary judgment.


New Orleans, Louisiana, this <u>8th</u> day of August 2012.

_____
          SARAH S. VANCE
  UNITED STATES DISTRICT JUDGE