```
                    UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF LOUISIANA


CHECKPOINT FLUIDIC SYSTEMS                      CIVIL ACTION
INTERNATIONAL, LTD.


VERSUS                                          NO: 10-4505


RAY GUCCIONE, SR., ET AL.                       SECTION: R
```

**ORDER AND REASONS**

Before the Court are Dyn-O-Mach, Inc.'s motions for summary judgment. The Court GRANTS defendant's motion on plaintiff's breach of contract claim based on the inapplicability of the written contract between the two parties, but DENIES the motion as to CheckPoint's claim for breach of an oral contract. Because there are questions of material fact as to whether Dyn-O-Mach violated the Louisiana Uniform Trade Secret Act ("LUTSA"), the Court DENIES Dyn-O-Mach's motion for summary judgment on plaintiff's LUTSA claim.

I.  BACKGROUND

This breach of contract and unfair competition case arises out a dispute between plaintiff CheckPoint Fluidic Systems and defendants Dyn-O-Mach, Inc., Ray Guccione and RAM Repairs, LLC. CheckPoint is a limited partnership that designs, manufactures and sells chemical injection pumps and pump components. Dyn-O-

Mach manufactures stainless steel parts for different products and is owned by Michael Olano. In 1994, Olano and CheckPoint's CEO Andrew Elliott discussed the possibility of Dyn-O-Mach's manufacturing parts for CheckPoint pumps,[1] and they executed a Non-Disclosure Agreement.[2] Olano testified that CheckPoint provided Dyn-O-Mach with detailed manufacturing drawings of the parts, which Dyn-O-Mach used to create a Computer Numeric Code (CNC) that gives instructions to its machines on how to produce the parts.[3] Elliott testified that from 1994 until 2009, Dyn-O-Mach made parts for CheckPoint's Series 1250 and 1500 chemical injection pumps.[4]

In 2008, the patents on CheckPoint's Series 1250 and 1500 pumps expired.[5] The next year, Guccione, previously a CheckPoint employee and now the manager of RAM, asked Dyn-O-Mach to reverse engineer CheckPoint pump components. Dyn-O-Mach and Guccione verbally agreed that Dyn-O-Mach would undertake the reverse engineering and in exchange would become the exclusive manufacturer of the pump parts.[6] Guccione provided Dyn-O-Mach

---

[1]   R. Doc. 151-7 at 5.

[2]   R. Doc. 151-4.

[3]   Olano Deposition (Exhibit D), p. 139-40.

[4]   R. Doc. 151-7 at 14.

[5]   *Id.* at 13-14.

[6]   R. Doc. 176-9 at 19-20.

with drawings of the CheckPoint pumps made by an outside engineer, as well as spare CheckPoint pumps, and worked with Dyn-O-Mach to create products known as Monkey Pumps.[7] Dyn-O-Mach machinist, James Myler, has admitted that he used CheckPoint's drawings on several occasions to create drawings for RAM.[8] Olano testified that the process of creating all of the Monkey Pump drawings from pump parts took about one and a half to two years to complete.[9] RAM sold its first Monkey Pump sometime around July 2009.[10]

On December 9, 2010, CheckPoint sued Guccione and RAM for trademark violations, the Louisiana Uniform Trade Secrets Act ("LUTSA"), the Louisiana Unfair Trade Practice and Consumer Protection Act ("LUTPA"), and breach of contract.[11]  On February 8, 2012, CheckPoint amended its complaint to name Dyn-O-Mach as a defendant, claiming that Dyn-O-Mach also violated LUTSA and breached its Non-Disclosure Agreement with CheckPoint.[12] Dyn-O-Mach has filed three motions for summary judgment, arguing that (1) the Non-Disclosure Agreement is not enforceable and if

---

[7]   R. Doc. 176-9 at 42, 46.

[8]   R. Doc. 176-4.

[9]   R. Doc. 176-9 at 10-11.

[10]  *Id.* at 49.

[11]  R. Doc. 1.

[12]  R. Doc. 113.

enforceable, has not been breached by Dyn-O-Mach;[13] (2) Dyn-O-Mach has not violated LUTSA because CheckPoint has no trade secrets to protect with respect to the Series 1250 and 1500 pumps;[14] and (3) CheckPoint lost any alleged trade secret protection through its disclosure of its alleged trade secrets to a third party, MozyPro, an internet company that backs up data.[15]

**II.  STANDARD**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of

---

[13]   R. Doc. 151.

[14]   R. Doc. 152.

[15]   R. Doc. 197.

law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith ex rel.*

*Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).

**III. DISCUSSION**

*A. Breach of Contract Claim*

<u>1. Non-Disclosure Agreement</u>

Contract interpretation is the determination of the common intent of the parties.  La. Civ. Code art. 2045.  The words of a contract must be given their generally prevailing meaning.  La. Civ. Code art. 2047.  When a contract is clear and explicit, no further interpretation may be made in search of the parties' intent.  La. Civ. Code art. 2046.  The issue of ambiguity of a contract is a legal question.  *Dore Energy Corp. v. Prospective Inv. & Trading Co., Ltd.*, 570 F.3d 219, 225 (5th Cir. 2009) (discussing the principles governing the interpretation of contracts under Louisiana law).  If the contract is not ambiguous, then interpreting it is also a legal issue for the court.  *Id.*  A court may consider extrinsic evidence as to the parties' intent only if the contract is ambiguous.  *See, e.g., Campbell v. Melton*, 817 So.2d 69, 75 (La. 2002).

CheckPoint asserts that Dyn-O-Mach violated the Non-Disclosure Agreement signed in 1994 by using CheckPoint's confidential design information to create RAM Monkey Pumps. Dyn-O-Mach maintains that the Non-Disclosure Agreement does not apply to the dispute. The Court finds that the Non-Disclosure Agreement

6

does not apply to the manufacturing relationship between CheckPoint and Dyn-O-Mach, because the agreement explicitly covered only the period during which the parties considered whether to form a business relationship with each other. The document states:

> Whereas, the Recipient wishes to obtain, and CheckPoint wishes to give, certain knowledge, data, plans, specifications . . . **for the sole and exclusive purpose of determining whether the parties wish to further pursue a manufacturing relationship** . . .
>
> It is hereby agreed, that for and in consideration of the mutual and valuable benefit of **determining whether a distribution relationship will be in the best interests of each party**. . . .
>
> For the purposes of this agreement, it is the intent of the parties, that such information is to be used for the **sole purpose of determining whether a distribution relationship between the parties should be established on terms and conditions to be agreed upon. It is not the intent of the parties, nor is it permissible by and under this agreement that said information be used by the recipient for any other purpose of any nature whatsoever**. . .[16]

By its terms, the document clearly states that the parties' agreement covered only the period in which the parties explored forming a business relationship and that CheckPoint provided the confidential drawings for the sole purpose of allowing the parties to assess the merits of such a relationship. Further, the document gives no indication that the terms of the agreement extended to any relationship thereafter developed between Dyn-O-

---

[16] R. Doc. 151-4 at 1.

Mach and CheckPoint, as it states that terms and conditions would follow if the parties established a business relationship.[17] CheckPoint provides no additional agreement concerning the terms and scope of parties' eventual manufacturing relationship. Thus, the Court holds that the Non-Disclosure Agreement unambiguously applied only to the negotiating phase of CheckPoint's and Dyn-O-Mach's relationship and does not govern a dispute that arises out of Dyn-O-Mach's alleged use of CheckPoint's information during the manufacturing process itself. Because the agreement does not apply to Dyn-O-Mach's manufacturing relationship with CheckPoint, it provides no basis for a contract claim against Dyn-O-Mach for Dyn-O-Mach's use of information covered by the earlier agreement. The Court need not address Dyn-O-Mach's other arguments concerning the invalidity of the agreement.

 2. Oral Contract

  CheckPoint also alleges that, even without the Non-Disclosure Agreement, Dyn-O-Mach breached an oral contract with CheckPoint. Under Louisiana law, an oral contract with a value of more than $500 must be proven by at least one witness and other corroborating evidence. La. Civ. Code art. 1846. "The plaintiff himself may serve as the witness to establish the existence of the oral contract . . . . But, the other corroboration must come from a source other than the plaintiff." *Suire v. Lafayette City-*

---

[17] R. Doc. 151-4 at 1.

*Parish Consol. Gov't*, 907 So. 2d 37, 58 (La. 2005) (internal citations omitted). The corroborating evidence "need only be general in nature." *Id.* The party claiming that a contract was formed has the burden of proving the contract's existence. *Price Farms, Inc. v. McCurdy*, 42 So. 3d 1099, 1104 (La. App. Ct 2010). CheckPoint contends that an oral agreement stemmed from the conversations between Elliott and Olano in 1994, in which they discussed the possibility of a manufacturing relationship. Elliott testifies that he asked Olano whether Dyn-O-Mach would have a problem keeping CheckPoint drawings confidential and that Olano said no;[18] Olano denies having discussed the confidentiality of CheckPoint's drawings with Elliott.[19] CheckPoint offers as corroborating evidence of an oral contract the relationship that formed between Dyn-O-Mach and CheckPoint, in which Dyn-O-Mach manufactured CheckPoint pump parts based on drawings that CheckPoint provided. In addition, CheckPoint presents Olano's testimony that Dyn-O-Mach kept CheckPoint's drawings in a locked cabinet[20] and points to Olano's acknowledgment that it would be improper for Dyn-O-Mach to use a client's drawings for another client's product.[21]

---

[18]   R. Doc. 178-3 at 11-12.

[19]   Olano Deposition (Exhibit D), p. 62.

[20]   R. Doc. 176-9 at 14 (Olano Deposition, p. 125).

[21]   *Id.* at 25; 27 (Olano Deposition, p. 202, 204).

Based on the foregoing evidence, the Court finds that CheckPoint has identified an issue of fact as to whether an oral contract existed in which Dyn-O-Mach agreed to keep CheckPoint's drawings confidential. As Elliott testified only to conversations regarding CheckPoint's drawings, the alleged oral contract does not extend to any other allegedly proprietary information.

*B. Violations of LUTSA*

LUTSA permits a complainant to recover damages for actual loss caused by the misappropriation of a trade secret. *See* La. Rev. Stat. § 51:1431. In order to recover damages under LUTSA, a complainant must prove (1) the existence of a trade secret; (2) the misappropriation of the trade secret by another; and (3) actual loss caused by the misappropriation. *See* La. Rev. Stat. § 51:1431; *Computer Mgmt Assistance Co. v. DeCastro, Inc.*, 220 F.3d 396, 403 (5th Cir. 2000).

The threshold determination under LUTSA is whether something constitutes a trade secret. The statute defines a "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>   (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
>   (b) is the subject of efforts that are reasonable under the circumstances to maintain secrecy.

La. Rev. Stat. § 51:1431(4). Whether something is a trade secret is a question of fact. *See Pontchartrain Med. Labs, Inc. v. Roche Biomedical Laboratories, Inc.*, 677 So. 2d 1086, 1091 (La. Ct. App. 1996); *United Group of Nat'l Paper Distribs., Inc. v. Vinson*, 666 So.2d 1338, 1344 (La. Ct. App. 1996). "'The efforts required to maintain secrecy are those reasonable under the circumstances, and courts do not require extreme and unduly expensive procedures to be taken to protect trade secrets.'" *Sheets v. Yamaha Motors Corp., U.S.A.*, 849 F.2d 179, 183 (5th Cir. 1988) (quoting *Tubular Threading, Inc. v. Scandaliato*, 443 So.2d 712, 714 (La. Ct. App. 1983)). Dyn-O-Mach argues that its actions do not violate LUTSA because (1) CheckPoint's pump patents had expired and thus the pumps were in the public domain; (2) CheckPoint lost any trade secrets it may have had by providing the confidential information to a third party and authorizing Dyn-O-Mach to disclose it to Richard Ellis; and (3) the language on CheckPoint's drawings requiring confidentiality did not restore the drawings' trade secret status.

### 1. Patent Expiration

Dyn-O-Mach contends that because the CheckPoint patents have expired, the Series 1250 and 1500 pumps are in the public domain and are readily ascertainable. Therefore, Dyn-O-Mach argues, any trade secrets CheckPoint may have had are no longer protected, including drawings of the pump that were included in the patent.

11

CheckPoint does not dispute that its pumps fall within the public domain and may be copied, such as by reverse engineering. Instead, CheckPoint presents evidence that the expiration of its patents does not eliminate protection for the manufacturing drawings of pump components that contain exact specifications and tolerances for mass manufacturing.[22]

Checkpoint is correct that the publication of a patent application makes its contents publically available but does not render unprotected the details about the product that do not appear in the patent. *See Tewari De-Ox Systems, Inc. v. Mountain States/Rosen, L.L.C*, 637 F.3d 604 (5th Cir. 2011) (holding that processes disclosed in patent applications are not trade secrets, but the unique combination of those available processes can constitute trade secrets); see *also Phillips v. Frey*, 20 F.3d 623, 628 (5th Cir. 1994) (upholding jury verdict of misappropriation when patent did not contain details about manufacturing process that were allegedly misused). CheckPoint seeks to protect specifications on the manufacturing drawings that were not included in the patent application, specifications that Elliott attests would provide CheckPoint with a competitive advantage over other companies attempting to create a similar pump.[23] Therefore, the expiration of the CheckPoint patents does

---

[22] *Compare* R. Doc. 176-2 at 7-10 *and* 176-9 at 32-38.

[23] R. Doc. 176-2 at 1-2.

not automatically foreclose trade secret protection for CheckPoint's manufacturing drawings.

Further, Dyn-O-Mach's Olano testified that a company with access to the drawings and the CNC machine code derived from them would be able to produce CheckPoint pumps without expending the time and money required to reverse engineer the pumps.[24] Thus, there is evidence that the manufacturing details were protectable as a trade secret because they "derive independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from [their] disclosure or use." La. Rev. Stat. § 51:1431(4)(a); *see, e.g., Rattler Tools, Inc. v. Bilco Tools, Inc.*, 2007 WL 2008504, at *28 (E.D. La. Jul. 6, 2007) (holding that drawings and specifications for company's tools were trade secrets). Accordingly, the expiration of CheckPoint's patents does not entitle Dyn-O-Mach to summary judgment.

### 2. Disclosure to Third Parties

Dyn-O-Mach next argues that CheckPoint lost any trade secret protection it may have had on its drawings by sharing the electronic version of its drawings with internet company MozyPro, so that the company could back up CheckPoint's data. A company must take reasonable efforts to protect the secrecy of an alleged

---

[24] Olano Deposition (Exhibit D), p. 198-200.

trade secret. La. Rev. Stat. § 51:1431(4); *see Reingold v. Swiftships, Inc.*, 126 F.3d 645, 650 (5th Cir. 1997) (citing as an example of reasonable efforts the lack of disclosure of the information in question). Dyn-O-Mach asserts that because CheckPoint relied on MozyPro's general terms of use and privacy policy rather than executing a non-disclosure agreement, CheckPoint has failed to safeguard its design information.

Dyn-O-Mach bases its claim on Andrew Elliott's deposition testimony that CheckPoint's drawings are backed up by MozyPro.[25] CheckPoint does not deny the statement but has produced evidence that Elliott was mistaken. CheckPoint provides a declaration from a CheckPoint employee, Rusty Mahoney, who purports to have superior knowledge and who states that CheckPoint does not use MozyPro to back up the data on its protected drawings.[26] Considering Mahoney's testimony, the Court finds that there is a disputed issue of fact as to whether CheckPoint released its manufacturing drawings to a third party. Further, the record reflects security measures in place at MozyPro, such as the encryption of data placed on the site,[27] which raise an issue of material fact as to whether CheckPoint took reasonable steps to

---

[25]   R. Doc. 219-2 at 6-8.

[26]   R. Doc. 215-2.

[27]   R. Doc. 215-5.

guard its information, even if the company did disclose its drawings to MozyPro.

Dyn-O-Mach also asserts that CheckPoint lost trade secret protection for its drawings by authorizing the disclosure of CheckPoint confidential information to Richard Ellis of RAM in the Non-Disclosure Agreement. The Agreement stated, "The recipient agrees not to discuss any information with any person other than Andrew C. Elliott or Richard K. Ellis without the prior written consent of CheckPoint."[28]  At the time the Non-Disclosure Agreement was signed, Ellis was a principal of CheckPoint. Thus, this provision is not evidence that CheckPoint failed to reasonably protect its trade secrets, because the disclosure was limited to CheckPoint's inner circle.

Last, CheckPoint has provided sufficient evidence to raise a material fact issue as to whether it took reasonable steps to protect its drawings. "LUTSA requires a party to take reasonable measures to maintain relative, not absolute, secrecy." *Reingold*, 126 F.3d at 650.  Elliott testified that CheckPoint tried to maintain the confidentiality of the drawings by requiring employees to sign a confidentiality agreement as a condition of employment, by password protecting certain confidential and proprietary information and limiting access to those passwords, and by requiring confidentiality agreements before disclosing

---

[28]   R. Doc. 151-4 at 2.

drawings.[29] Accordingly, Dyn-O-Mach is not entitled to summary judgment on the issue of whether CheckPoint failed to reasonably protect its design drawings as trade secrets under LUTSA.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part defendant's motion on CheckPoint's claim for breach of contract, and DENIES defendant's motions for summary judgment on the issue of CheckPoint's trade secret claims.

New Orleans, Louisiana, this 17th day of August 2012.

_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

---

[29] R. Doc. 160-2 at 2.