UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHECKPOINT FLUIDIC SYSTEMS                    CIVIL ACTION
INTERNATIONAL, LTD.

VERSUS                                        NO: 10-4505

RAY GUCCIONE, SR., ET AL.                     SECTION: R

<u>**ORDER AND REASONS**</u>

Before the Court are Ray Guccione's motion for partial
summary judgment on CheckPoint's claim for breach of fiduciary
duty and RAM Repairs and Guccione's motion for partial summary
judgment on peremption grounds for claims under the Louisiana
Uniform Trade Secrets Act ("LUTSA"), the Louisiana Unfair Trade
Practice and Consumer Protection Act ("LUTPA"), and the Lanham
Act. Also before the Court are CheckPoint's motions for partial
summary judgment on the issues of whether its materials
constitute trade secrets, whether defendants are barred from
using reverse engineering as a defense, and whether Guccione
breached his confidentiality agreement and assignment agreement.
For the reasons stated below, the Court GRANTS defendants' motion
for summary judgment on some but not all Lanham Act and LUTPA
issues. Further, the Court finds that CheckPoint's breach of
fiduciary duty claim against Guccione is perempted and
accordingly GRANTS Guccione's motion on that claim. Because
genuine issues of material fact exist on the remaining questions,

the Court DENIES the motions for summary judgment in all other respects.

## I.    BACKGROUND

This trademark infringement, false advertising and unfair competition case arises out of a dispute between plaintiff CheckPoint Fluidic Systems and defendants Ray Guccione and RAM Repairs LLC.  CheckPoint is a Texas limited partnership that designs, manufactures and sells chemical injection pumps and pump components.  Guccione was formerly the vice president and twenty percent owner of Cross Pump International, Inc., a company that designed chemical injection pumps.[1]  On October 18, 1993, Cross Pump executed a sales agreement with Elliott/Ellis Enterprises, Inc. ("EEI"), in which it transferred to EEI its physical inventory, all of the patents it owned or was developing, and exclusive rights to its intellectual property.[2]  Specifically, EEI obtained through the Sales Contract:

> the sole, exclusive, and irrevocable worldwide right to
> develop, manufacture, market, sell, assign, license
> and/or distribute products, patents, and/or designs
> referred to or based on [any and all patents currently
> owned by Cross Pump and Cross Pump's physical
> inventory]..., and any and all future designs and/or
> products [Cross Pump] may develop from time to time
> related to products, patents, and/or designs referred

---

[1]    R. Doc. 160-2 at 19; 160-7 at 14.

[2]    R. Doc. 137-4.

to or based on [Cross Pump's patents and physical inventory].[3]

EEI also purchased "[t]he complete and irrevocable right of first refusal to review and/or acquire any intellectual property developed by [Cross Pump]."[4]  The Sales Contract included a "Patent, Trademark & Trade Secrets Assignment" ("Assignment Agreement"),[5] as well as a "Confidentiality and Non-Competition Agreement" between EEI and Guccione ("Confidentiality Agreement").[6] EEI paid Cross Pump $15,000 for its goodwill,[7] and $22,000 for its patents, intellectual property and inventory.[8] EEI also agreed to pay royalties to Cross Pump for 99 years in the amount of three percent of the domestic revenues and one percent of the international revenues generated by the assets transferred in the sale.[9]  CheckPoint asserts that although improvements have been made to the pumps listed in the Sales Contract, CheckPoint's Series 1250 and Series 1500 chemical

--------

[3]     R. Doc. 137-4 at 6.

[4]     *Id.* at 8.

[5]     R. Doc. 160-2 at 20-32.

[6]     R. Doc. 137-5.

[7]     A portion of the goodwill payment was made as a pre-payment on July 19, 1993. See R. Doc. 160-2 at 11.

[8]     R. Doc. 160-2 at 11.

[9]     *Id.* at 12.

3

injection pumps are based on pumps listed in the Sales Contract.[10]

CheckPoint represents that EEI assigned CheckPoint its rights under the Sales Contract when the CheckPoint limited partnership was formed on November 1, 1993.  Under the terms of the Sales Contract, EEI could not assign all of the Cross Pump assets without obtaining Cross Pump's permission.[11] But, the agreement allowed EEI to form another entity to carry out the Sales Contract as long as it maintained control of a majority of the equity interest in that entity.[12] EEI obtained a 70 percent majority interest in CheckPoint.[13]

Guccione became an employee and limited partner of CheckPoint in November 1993.  CheckPoint alleges that in this role, Guccione had access to valuable proprietary information. In his declaration, CheckPoint's CEO, Andrew Elliott, asserts that CheckPoint consistently took steps to maintain the confidentiality of its proprietary information, including limiting access to such information, requiring confidentiality agreements before disclosing sensitive information, and adopting company policies that required log-in information and passwords

---

[10]   R. Doc. 160-2 at 2.

[11]   R. Doc. 189-6 at 18.

[12]   *Id.* at 8.

[13]   *Id.* at 45, 52.

before accessing design drawings.[14]  Guccione's employment with CheckPoint ended on December 15, 2005, but he continues to be a limited partner in CheckPoint.

After leaving CheckPoint, Guccione became the managing partner and a thirty-six percent owner of RAM, a company that manufactures chemical injection pumps called "Monkey Pumps". Guccione formed RAM along with Gemelli Investments, Inc., owned by Richard Ellis,[15] Richard Ellis's brother, David, and employees of Gly-Tech Services, Inc., a CheckPoint customer.  RAM initially acted as a third-party repair business for pumps.[16]  In July 2009, RAM began selling its own pumps.[17]  CheckPoint complains that RAM and Guccione designed the Monkey Pumps through the use of Checkpoint's confidential and proprietary information and trade secrets. Defendants contend that they developed Monkey Pumps independently with their contractor Dyn-O-Mach Inc., a manufacturing company.

CheckPoint had already engaged Dyn-O-Mach to produce CheckPoint pump parts. As part of that process, CheckPoint provided Dyn-O-Mach with detailed manufacturing drawings of its

---

[14]    R. Doc. 160-2 at 2.

[15]    Richard Ellis founded EEI and CheckPoint with Andrew Elliott in 1993 and sold his interest in EEI in 2003.

[16]    R. Doc. 160-7 at 11.

[17]    R. Doc. 176-9 at 49.

pump parts, which Dyn-O-Mach used to create a Computer Numeric Code ("CNC") that instructs machines how to produce the parts.[18] CheckPoint asserts that Guccione knew of the relationship between CheckPoint and Dyn-O-Mach because Guccione regularly called Dyn-O-Mach regarding parts orders when he was a Checkpoint employee.[19]

In 2008, the patents on CheckPoint's Series 1250 and 1500 pumps expired.[20]  In February 2008, Guccione hired Ha Tran Quach to make drawings of these CheckPoint pumps.[21]  Quach finished the last drawings in June 2008.[22]  At some point after June 2008, Dyn-O-Mach agreed to reverse engineer the components for one of the CheckPoint pumps for Guccione.[23]  In exchange, Dyn-O-Mach became the exclusive manufacturer of those parts.[24]

To facilitate the reverse engineering process, Guccione provided Dyn-O-Mach with drawings of the pumps made by Quach, as well as other drawings of unknown origin, and spare CheckPoint

---

[18]    Olano Deposition (Exhibit D), p. 139-40.

[19]    R. Doc. 160-7 at 19.

[20]    R. Doc. 151-7 at 13-14.

[21]    R. Doc. 160-7 at 29.

[22]    *Id.* at 33.

[23]    *Id.* at 18.

[24]    *Id.* at 53.

parts.[25]  Guccione was "actively involved"[26] in the reverse
engineering process.  Guccione approved and revised the drawings
as Dyn-O-Mach created them and provided Dyn-O-Mach with the
tolerances for the measurements of the parts.[27,28] Michael Olano,
the owner of Dyn-O-Mach, testified that Guccione told Dyn-O-Mach
not to use CheckPoint materials in the production of RAM parts,
and so Dyn-O-Mach did not refer to CheckPoint drawings.[29]
Nevertheless, although he initially denied it,[30] Dyn-O-Mach
machinist James Myler later admitted that he used CheckPoint's
drawings on several occasions to create drawings for RAM.[31]

    After the design drawings were complete, Dyn-O-Mach created
a CNC code for the RAM Monkey Pumps.  As the CNC code is based on
the design drawings, it cannot be created until the design
drawings are complete.[32] Myler testified that he also used
portions of the CNC code that Dyn-O-Mach created from

------

[25]    R. Doc. 176-9 at 54.

[26]    Guccione Deposition (Exhibit A), p. 126.

[27]    Guccione Deposition (Exhibit A), p. at 160.

[28]    A tolerance is a determination of how far a
manufactured part can vary from the design drawing measurements
before that part is considered defective.

[29]    Olano Deposition (Exhibit D), p. 53.

[30]    R. Doc. 176-9 at 82.

[31]    R. Doc. 176-4.

[32]    Myler Deposition (Exhibit E), p. 17.

CheckPoint's pump drawings to create the CNC code for RAM's Monkey Pumps.[33]  Olano testified that the process of creating all of the drawings from CheckPoint pump parts took about one and a half to two years.[34]  Guccione brought the first box of parts to Dyn-O-Mach several months after Quach finished the drawings in June 2008.[35]  Guccione testified that RAM first began selling Monkey Pumps sometime around July 2009.[36]

On December 9, 2010, CheckPoint sued Guccione and RAM for violations of the Lanham Act, trademark infringement and dilution, and false advertising.[37]  Plaintiff also asserted violations of the Louisiana Uniform Trade Secrets Act ("LUTSA"), the Louisiana Unfair Trade Practice and Consumer Protection Act ("LUTPA"), state law trademark infringement, breach of fiduciary duty, and breach of contract. CheckPoint later added Dyn-O-Mach as a defendant.

RAM and Guccione now seek partial summary judgment on CheckPoint's LUTSA, Lanham Act, and LUTPA claims on the grounds of peremption. Guccione also moves for partial summary judgment on CheckPoint's claim for breach of fiduciary duty. In addition,

---

[33]   R. Doc. 176-9 at 84-85.

[34]   R. Doc. 176-9 at 10-11.

[35]   Guccione Deposition (Exhibit A), p. 145.

[36]   *Id*. at 129.

[37]   R. Doc. 1.

CheckPoint moves for partial summary judgment, arguing that (1) its manufacturing drawings and CNC code are trade secrets protected under LUTSA, (2) defendants cannot assert that Monkey Pumps were reverse engineered as a defense to LUTSA; (3) Guccione breached his Confidentiality Agreement; and (4) Guccione breached the 1993 Assignment Agreement.

## II.  STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for

summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith ex rel.*

10

*Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).

## III. DEFENDANTS' MOTIONS

*A. Peremption of LUTSA, Lanham Act, and LUTPA claims*

Defendants move for partial summary judgment on the grounds that CheckPoint's claims under LUTSA, the Lanham Act, and LUTPA are time-barred.

### 1. LUTSA

LUTSA's "prescriptive period" provides that claims of trade secret misappropriation must be brought "within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." La. Rev. Stat. § 51:1436. It further provides that a continuing misappropriation constitutes a single claim. *Id.*  CheckPoint alleges that defendants violated LUTSA through Guccione's use of CheckPoint's customer and vendor lists, through Guccione's provision of CheckPoint's tolerances to Dyn-O-Mach, and through defendants' knowingly benefitting from Dyn-O-Mach's use of CheckPoint's protected materials in the creation of Monkey Pumps.

Defendants contend that CheckPoint knew that Guccione took his "black book" of contacts and other materials when he was fired in 2005, more than three years before the suit began. But, the deposition of Andrew Elliott cited as evidence does not

11

support this assertion.[38]  Elliott testified that CheckPoint knew that Guccione had taken a box of materials when he left the company.[39] He explained, however, that CheckPoint did not know what was in the box that Guccione took and that it could have contained personal items.[40] Further, CheckPoint contends that until the book was produced in June 2012 as part of discovery, CheckPoint was unaware that Guccione had retained the book and used it to access CheckPoint vendors and customers.[41] Based on the foregoing evidence, the Court finds that there is a material issue of fact as to whether CheckPoint should have discovered that Guccione retained confidential customer and vendor information more than three years before it filed suit under LUTSA.

In addition, CheckPoint contends that it could not have known of RAM's use of CheckPoint's design specifications, through either Guccione's alleged use of CheckPoint tolerances or Dyn-O-Mach's reliance on CheckPoint drawings and CNC code, until Monkey Pumps went on the market in July 2009. In support of this contention, CheckPoint offers Elliott's deposition testimony that CheckPoint became aware of Monkey Pumps and their similarity to

---

[38]     *See* R. Doc. 192-4.

[39]     R. Doc. 192-4 at 5-6.

[40]     *Id*.

[41]     R. Doc. 220 at 12.

CheckPoint products in July of 2009.[42] As CheckPoint has produced
evidence that its discovery of defendants' alleged
misappropriation did not occur earlier than three years of its
filing suit, defendants are not entitled to summary judgment that
plaintiff's LUTSA claim for the use of its drawings,
specifications, and CNC code, is time-barred.

    2. <u>Lanham Act</u>

    The Lanham Act does not contain a federal statute of
limitations, and courts therefore "look to the most appropriate
or most analogous state statute of limitations". *Curtis v.
Benson*, 959 F. Supp. 348, 353 (E.D. La. 1997).  In applying the
state statute of limitations, courts typically apply the state's
tolling provisions as well. *See Conopco, Inc. v. Campbell Soup
Co.*, 95 F.3d 187 (2d Cir. 1996) (looking to the most analogous
state statute of limitations for laches purposes in a Lanham Act
case); *see also Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1145
(5th Cir. 1997) (borrowing state tolling rules for actions under
§§ 1981 and 1983). The Court finds LUTPA to be the most analogous
Louisiana statute of limitations for CheckPoint's Lanham Act
claims, because both statutes govern unfair competition, the
gravamen of CheckPoint's claims. *See Snowizard, Inc. v. Robinson*,
No. 11-515, 2011 WL 2681197, at *6 (E.D. La. July 8, 2011)
(applying LUTPA's statute of limitations to Lanham Act claims as

---

    [42]    Elliott Deposition (Exhibit C), p. 215-16.

the law of "unfair competition in Louisiana is governed under the Unfair Trade Practices and Consumer Protection Law").[43] LUTPA provides a one year period in which to file suit in La. RS. § 51:1409(E), "running from the time of the transaction or act that gave rise to th[e] cause of action." Although the Louisiana Supreme Court has stated that the question of whether the period in La. RS. § 51:1409(E) is prescriptive or peremptive has not yet been decided, *Miller v. Conagra, Inc.*, 991 So. 2d 445, 456 (La. 2008), Louisiana Courts of Appeal have consistently held that the limitations period in  La. RS. § 51:1409(E) is peremptive, not prescriptive. *See, e.g., Glod v. Baker,* 899 So. 2d 642 (La. Ct. App. 2005); *Canal Marine Supply, Inc. v. Outboard Marine Corp. of Waukegan, Illinois and Mid-City Marine, Inc.* 522 So. 2d 1201 (La. Ct. App. 1988). A peremptive statute does not allow for suspension or interruption. *State Through Div. of Admin. v. McInnis Bros. Const.*, 701 So. 2d 937, 939 (La. 1997) (citing La. Civ. Code 3461). Specifically, a peremptive period is not subject to suspension under *contra non valentem. Id.*

In support of their peremption argument, defendants submit evidence indicating that CheckPoint believed that RAM had copied CheckPoint pumps and was marketing RAM's products as identical to

---

[43]     *But see Sharif v. New Orleans Metropolitan Convention & Visitors Bureau,* No. 08-4891, 2009 WL 701731, at *1 (E.D. La. March 17, 2009) (citing *Curtis*, 959 F. Supp. at 353) (applying the statute of limitations for fraud to Lanham Act claims).

CheckPoint's around the time Monkey Pumps became publicly available in July 2009.[44] But, LUTPA's limitations period runs from the time of the act that gives rise to the cause of action, La. Rev. Stat. § 51:1409(E), not from the time a party became aware of the wrongful act. Thus, under a peremption analysis, the act causing the period to run was the placement of Monkey Pumps on the market in July 2009 with accompanying advertisements. Yet, CheckPoint did not file suit until December 9, 2010.

CheckPoint contends that its claims are not perempted, because the defendants engaged in a continuing violation, which kept the peremptive period from running. A continuing violation or tort is one in which "the operating cause of injury is a continuous one and gives rise to successive damages." *Miller*, 991 So. 2d at 456. "When a plaintiff attempts to avail herself of the continuing tort theory, the plaintiff bears the burden of establishing its applicability." *James v. New Century Mortgage Corp.*, No. 04-194, 2006 WL 2989242, at *6 (E.D. La. Oct. 17, 2006). If the doctrine applies, the limitations period does not begin to run until the violation ceases. *See, e.g., Tubos de Acero de Mexico, S.A. v. American Intern. Inv. Corp., Inc.*, 292 F.3d 471, 481 (5th Cir. 2002).

---

[44]    Elliott Deposition (Exhibit C), p. 216-33.

Whether the continuing violation doctrine applies under La. RS. 51:1409(E) has not been squarely decided by the Louisiana Supreme Court. In *Tubos*, the Fifth Circuit held that the doctrine did apply to LUTPA, and therefore until the violation ended, the peremptive period did not begin to run. 292 F.3d at 481-82. But, the Court's analysis relied on the opinions of only one court, the Louisiana First Circuit Court of Appeal. *Id.* These Louisiana First Circuit cases in turn cited the Louisiana Supreme Court's analysis of the effect of a continuing tort on a *prescriptive* statute. *See Capital House Preservation Co. v. Perryman Consultants, Inc.*, 725 So. 2d 523 (La. Ct. App. 1998) (citing *South Central Bell Telephone v. Texaco, Inc.*, 418 So. 2d 531, 533 (La. 1982); *see also Benton, Benton & Benton v. La. Pub. Facilities Auth.*, 672 So. 2d 720 (La. Ct. App. 1996). Noting this misplaced reliance on prescription cases, the Court of Appeal for the Third Circuit subsequently held that the continuing tort doctrine does not apply to LUTPA's peremptive period, given Louisiana precedent that the continuing violation doctrine does not apply to peremptive statutes. *Glod v. Baker*, 899 So. 2d 642, 646-49 (La. Ct. App. 2005) (citing *Bel v. State Farm Mut. Auto Ins. Co.*, 845 So. 2d 377 (La. App. Ct. 2003); *Dauterive Contractors, Inc. v. Landry & Watkins*, 811 So. 2d 1242 (La. App. Ct. 2002)); *see also Suhren v. Gilbert*, 55 So. 3d. 941 (La. App. Ct. 2011). The Louisiana Fourth Circuit Court of Appeal and at

16

least one federal court take a similar view in holding that LUTPA is not subject to the continuing violation doctrine. *See Canal Marine Supply, Inc.*, 899 So. 2d at 1203; *CamSoft Data Systems, Inc. v. Southern Electronics Supply, Inc.*, No. 09-1047, 2011 WL 3204701 (M.D. La. July 27, 2011) (applying the analysis of *Glod* and holding that the continuing violation doctrine does not apply under LUTPA).

The Court's conclusion in *Glod* is supported by a statement by the Louisiana Supreme Court in *Miller v. Conagra*, a case in which the Court held that the defendant's conduct did not amount to a continuing violation. 991 So. 2d at 16. The Court stated, "Because we conclude that [defendant] has not committed a continuing violation of LUTPA, we find it unnecessary to address whether LSA-RS. 51:1409(E) is a prescriptive or peremptive statute. Regardless of how LSA-R.S. 51:1409(E) is interpreted, [plaintiff]'s LUTPA claim is untimely." *Id*. at 456-57. Because the Court indicated that it would have had to have decided the prescription versus peremption issue if it had found a continuing violation, its statement suggests that the continuing violation doctrine would not apply if the Court found La. RS. 51:1409(E) to be peremptive. If the continuing violation doctrine applied to both prescriptive and peremptive statutes, there would be no need for such a decision. Such an inference is consistent with the Louisiana Supreme Court's conclusion that the continuing

17

violation theory does not apply to the peremptive period for legal malpractice claims. *Reeder v. North*, 701 So. 2d 1291, 1297-99 (La. 1997) (rejecting attorney's continuous representation as basis on which to extend time period for legal malpractice claims); *see also* Justin Woodard, Comment, *Unnecessary to Address?: Tackling the Louisiana Supreme Court's Open Question of Whether a Continuing Tort Can Suspend the Louisiana Unfair Trade Practices Act One Year Peremptive Period*, 85 Tul. L. Rev. 865 (2011).

Although this Court concludes that the better view of Louisiana statutory law and jurisprudence is that the continuing violation doctrine does not apply under LUTPA, if La. RS. 51:1409(E) is peremptive, the Louisiana Supreme Court has not ruled squarely on the issue, and the Fifth Circuit's opinion to the contrary has not been overruled. This Court is therefore bound by the Fifth Circuit's holding that La. RS. 51:1409(E) is a peremptive period, but it does not begin to run until a continuing violation ceases. *See Tubos de Acero de Mexico, S.A.* 292 F.3d at 481-82. Therefore, if CheckPoint demonstrates that defendants committed a continuing violation of the Lanham Act, it may recover damages for defendants' acts that occurred in the year before December 9, 2010, when CheckPoint filed suit. *See R.J. Reynolds Tobacco Co. v. Hudson*, 314 F.2d 776, 781 (5th Cir. 1963) (stating that under the continuing tort doctrine, a

plaintiff may recover for damages inflicted within the period of limitations immediately preceding the filing of the complaint).

CheckPoint's Lanham Act claims are based on three distinct types of conduct by defendants: 1) their removal of CheckPoint identifiers when repairing CheckPoint pumps and their application of RAM Repairs stickers, 2) their failure to use CheckPoint parts when repairing CheckPoint pumps, and 3) their advertisement of Monkey Pumps as being identical to CheckPoint pumps.  Under the Lanham Act, a person is liable for

> Us[ing] in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact or false or misleading representation of fact, which
> (A) is likely to cause confusion. . . or to deceive as to the . . . origin, sponsorship, or approval of his or her goods . . . or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods.

15 U.S.C. §1125 (a)(1).

These prohibitions cover two main types of activities, "the false advertising of goods or services; and 'palming off', which involves selling one's goods under the name of a competitor." *Roho, Inc. v. Marquis*, 902 F.2d 356, 359 (5th Cir. 1990). The Lanham Act also extends to "reverse palming off", which occurs when a person "remov[es] or obliterat[es] the original trademark, without authorization, before reselling goods produced by someone else." *Id.* (internal quotation omitted).

At the outset, defendants contend that the repair activities that CheckPoint challenges do not violate the Lanham Act. As discussed above, CheckPoint has presented evidence that RAM removed CheckPoint identifiers and applied RAM Repairs stickers to CheckPoint pumps when RAM repaired them.[45] Guccione testified that this was done to identify the repair work as RAM's.[46] These actions do not represent reverse palming off, because there is no evidence that defendants sold the CheckPoint pumps after removing the identification and making repairs. *See Roho, Inc.*, 902 F.2d at 359 (stating that palming off and reverse palming off involve, respectively, selling one's own goods or reselling another's goods). Moreover, this conduct does not violate the Lanham Act for another reason. It has been held that "the Lanham Act does not apply in the narrow category of cases where a trademarked product is repaired, rebuilt, or modified at the request of the product's owner". *Karl Storz Endoscopy-America, Inc. v. Fiber Tech Med., Inc.*, 4 Fed. Appx. 128, 131 (4th Cir. 2001); *see also Metropcs Wireless, Inc. v. Virgin Mobile USA, L.P.*, No. 3:08-CV-1658, 2009 WL 3075205 (N.D. Tex. Sept. 25, 2009).

This same principle applies to CheckPoint's evidence that defendants used RAM parts to repair CheckPoint pumps that the

---

[45]   R. Doc. 220-6 at 4-5

[46]   *Id.* at 5.

products' owners had asked RAM to repair. *See generally Aro Mfg. Co. v. Convertible Top Replacement*, 365 U.S. 336, 346 (1961) ("Mere replacement of individual unpatented parts, one at a time, whether of the same part repeatedly or different parts successively, is no more than the lawful right of the owner to repair his property."); *B. H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1263 (5th Cir. 1971)("The copying of an unprotected part for replacement purposes, whether done correctly or not, is not litigable by the originator, so long as there is no 'palming off' as to source."). In addition, CheckPoint has not demonstrated that defendants falsely designated their pump parts as CheckPoint parts or that they transformed the repaired pumps into a new product passed off as CheckPoint's. Rather, RAM labeled itself as the source of the repairs, not the originator of the pumps.

As to CheckPoint's claim that RAM falsely advertised its products as identical to CheckPoint's, defendants point to evidence that CheckPoint believed that RAM was marketing Monkey Pumps in this manner as soon as Monkey Pumps came on the market in July 2009.[47] Thus, defendants contend, CheckPoint's claim is time-barred. Yet although RAM's marketing may have begun over a year before CheckPoint filed suit, CheckPoint has produced evidence that defendants continued to market Monkey Pumps as

---

[47]    Elliott Deposition (Exhibit C), p. 216-23.

identical to CheckPoint pumps through 2010. An email sent on
September 30, 2010 by a RAM sales representative to a prospective
customer stated, "RAM Repairs' trademark Monkey Pump pneumatic
chemical injection pump is identical to the CheckPoint 1250 Pump.
Therefore, the replacement parts are identical and
interchangeable."[48] It is true that Richard Ellis testified that
RAM did not instruct its employees to equate RAM's and
CheckPoint's pumps.[49] Nevertheless, CheckPoint's evidence is
sufficient to raise an issue of fact as to whether defendants
continued to market their products as identical to CheckPoint's
pumps within the one-year period before CheckPoint filed suit.
*See generally Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813
(7th Cir. 1999) (most Lanham Act claims involve continuing
wrongs); *see also* J. Thomas McCarthy, *McCarthy on Trademarks and
Unfair Competition* § 31.33 (4th ed. 2001).

Further, CheckPoint has submitted evidence that defendants'
representations were untrue. Defendants' expert report identified
differences between the companies' parts and found that some of
the Monkey Pump parts "appeared to be [of] slightly less quality"
than CheckPoint pump parts.[50] This evidence creates a question of

---

[48]   R. Doc. 220-10 at 1.

[49]   RAM 30(b)(6) Deposition, Richard Ellis, (Exhibit E), p.
272-73.

[50]   R. Doc. 220-2 at 6.

22

fact as to whether RAM committed a continuing violation of the Lanham Act by falsely marketing its products as identical to CheckPoint's pumps from the inception of the Monkey Pump in 2009 through at least 2010. Therefore, CheckPoint's Lanham Act claim, that defendants' advertisements falsely equated the two companies' products, is not time-barred.

   3. LUTPA

   As previously discussed, LUTPA is governed by a one-year peremptive period. LUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405. Because RAM's repair activities do not violate the Lanham Act, they do not amount to unfair competition under LUTPA. *See, e.g., Roho, Inc.*, 902 F.2d at 359; *Karl Storz Endoscopy-America, Inc.*, 4 Fed. Appx. at 131.  RAM did not resell any CheckPoint pumps after removing the labels or misrepresent its products as Checkpoint's, and thus, RAM's repair activities are not the type of "unethical, oppressive, unscrupulous, or substantially injurious" conduct condemned under LUTPA. *Bolanos v. Madary*, 609 So. 2d 972, 977 (La. App. Ct. 1992), *writ denied,* 615 So. 2d 339 (La. 1993). Nevertheless, CheckPoint's evidence of defendants' false representations in advertising and marketing Monkey Pumps does support a claim for unfair competition under LUTPA. Therefore, for the reasons discussed above, CheckPoint may recover damages

23

it sustained within the year before suit that resulted from
proven violations of LUTPA.

   *B. Breach of Fiduciary Duty*

   Guccione also seeks summary judgment on CheckPoint's claim
for breach of fiduciary duty. He contends that he owed CheckPoint
no fiduciary duty because he did not exercise the requisite
control as a limited partner. Under Louisiana choice of law
rules, "the law of the place where the corporation was
incorporated governs disputes regarding the relationship between
the officers, directors, and shareholders and the officers' and
directors' fiduciary duties." *Torch Liquidating Trust ex rel.*
*Bridge Associates L.L.C. v. Stockstill*, 561 F.3d 377, 385 n.7
(5th Cir. 2009). As CheckPoint is a Texas limited partnership,
Texas law governs Guccione's duties. Under Texas law, a person's
status as a limited partner without control over the partnership
does not give rise to fiduciary duties. *See Strebel v. Wimberley*,
No. 01-10-00227-CV, 2012 WL 112253 (Tex. App. Jan. 12, 2012).
CheckPoint concedes that Guccione never had operational control
of CheckPoint as a limited partner. Therefore, Guccione's status
as a limited partner did not give rise to a fiduciary duty.

   Nevertheless, CheckPoint claims that Guccione's fiduciary
duty derives from his position as a CheckPoint employee, rather
than as a limited partner. Although Texas law governs Guccione's
status as a limited partner, on occasion courts have looked to

24

two states' laws on issues of fiduciary duty under Louisiana's
choice of law statute. *See* La. Civ. Code art. 3515 (an issue
should be "governed by the law of the state whose policies would
be most seriously impaired if its law were not applied to that
issue"). In *D & J Tire, Inc. v. Hercules Tire & Rubber Co.*, the
Fifth Circuit held that Connecticut law should determine the duty
directors owe to shareholders, as the defendant was a Connecticut
corporation, but that Louisiana law should apply to the
plaintiff's fiduciary duty under a mandate entered into in
Louisiana. 598 F.3d 200, 204-05 (5th Cir. 2010). Such a
distinction is appropriate in the present case, as CheckPoint is
a Texas limited partnership, but Louisiana has a strong interest
in the proceedings, given that Guccione worked as a CheckPoint
employee in Louisiana[51] and his alleged misuse of CheckPoint
materials following his termination of employment occurred here.
Further, Texas's laws governing the protection of confidential
materials after termination are similar to those of Louisiana.
*See Renewdata Corporation v. Strickler*, No. 03-05-00273-CV, 2006
WL 504998 (Tx. App. March 3, 2006). Consequently, no conflict
arises from the application of Louisiana law regarding the
fiduciary duty of employees.

CheckPoint points out that, while LUTSA governs most claims
of misappropriation, LUTPA recognizes a claim for breach of

---

[51]    R. Doc. 216-2 at 3-4.

fiduciary duty that rests on the misappropriation of information that is confidential but not a trade secret. *See Defcon v. Webb*, 687 So.2d 639, 642-43 (La. Ct. App. 1997).  Indeed, relief under LUTPA may be available when "a former employee breaches his duty not to use his former employer's confidential information." *L-3 Communications Westwood Corp. v. Robichaux*, No. 06-279, 2008 WL 577560, at *5  (E.D. La. Feb. 29, 2008) (citing *NCH Corp. v. Broyles*, 749 F.2d 247 (5th Cir. 1985)). CheckPoint asserts that Guccione breached this duty by using CheckPoint's pump tolerances and contacts. Defendants have asserted that CheckPoint's LUTPA claims are perempted, but they did not address the conduct at issue here. Nevertheless, under Louisiana law, "peremption may be pleaded or it may be supplied by a court on its own motion at any time prior to final judgment." La. Rev. Stat. art. 3460. As the consensus of the Courts that have decided the issue is that LUTPA's one-year limitations period is peremptive, the Court may raise the issue of peremption on its own. *See, e.g., Conorly v. State of Louisiana Through the Louisiana State Penitentiary and the Department of Corrections*, 858 So. 2d 636 (La. Ct App. 2003) (holding statute to be prescriptive rather than peremptive, thus preventing the Court from raising time bar on its own motion).

Drawing on the extensive record, most of which was furnished by CheckPoint, the Court finds that no questions of material fact exist, and CheckPoint's claims that Guccione breached his

26

fiduciary duty are perempted as a matter of law. CheckPoint filed suit against RAM and Guccione in December 2010. CheckPoint's claim that Guccione used its tolerances relates to conduct that occurred in the design phase of Monkey Pumps. Because Monkey Pumps were available by July 2009,[52] Guccione would have had to have provided any confidential CheckPoint information to Dyn-O-Mach before that date, over a year before suit was filed.

As to Guccione's alleged use of CheckPoint's customer and vendor lists, Elliott, in his declaration, stated that Guccione's "black book" contained contact information for many of the clients and vendors that CheckPoint worked with at the time Guccione was a CheckPoint employee.[53] CheckPoint has also presented invoices from RAM, demonstrating that RAM sold products to some of these same CheckPoint customers as late as 2011.[54] Evidence that defendants sold pumps or parts to CheckPoint's customers in the year before CheckPoint filed suit does not create a question of fact as to whether Guccione violated his fiduciary duty within that time period through the use of CheckPoint customer or vendor lists. Guccione admitted that he took his black book with him in 2005, but this action occurred

---

[52]    R. Doc. 176-9 at 49.

[53]    R. Doc. 204-15 at 20-21.

[54]    R. Doc. 204-15 at 54-64.

27

five years before the lawsuit was filed and four years before
Monkey Pumps went on the market. Guccione was already familiar
with CheckPoint's customers and vendors through his employment at
the company, and he worked in the pump repair business before he
joined CheckPoint. Further, Guccione denied using CheckPoint
information in marketing Monkey Pumps.[55] It is not a breach of
fiduciary duty for former employees "to solicit the clients of
their former employers as long as they do so based on their
memory, experience, or personal contacts, rather than through the
use of confidential information of the former employer's."
*Frederic v. KBK Fin., Inc.*, No. 00-0481, 2001 WL 30204, at *5
(E.D. La. Jan. 9, 2001) (citing *First Page Operating Under the
Name and Corporate Entity, Groome Enterprises, Inc. v. Network
Paging Corp.*, 628 So. 2d 130, 132-33 (La. App. Ct. 1993)).
Therefore, absent dates of Guccione's alleged wrongful acts of
using his black book containing CheckPoint's information to
access customers and vendors, there is no issue of material fact
that CheckPoint's breach of fiduciary duty claim with respect to
Guccione's black book is perempted.

---

[55]     Guccione Deposition (Exhibit A), p. 80.

## IV. Plaintiff's Motions

### A. Trade Secrets

Checkpoint seeks summary judgment on the question of whether its manufacturing drawings and the corresponding CNC code constitute trade secrets under LUTSA. LUTSA permits a complainant to recover damages for actual loss caused by the misappropriation of a trade secret. *See* La. Rev. Stat. § 51:1431. The threshold determination under LUTSA is whether information constitutes a trade secret.  The statute defines a "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>> (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
>> (b) is the subject of efforts that are reasonable under the circumstances to maintain secrecy.

La. Rev. Stat. § 51:1431(4). Whether something is a trade secret is a question of fact. *See Pontchartrain Med. Labs., Inc. v. Roche Biomedical Labs., Inc.*, 677 So.2d 1086, 1091 (La. Ct. App. 1996); *United Group of Nat'l Paper Distribs., Inc. v. Vinson*, 666 So.2d 1338, 1344 (La. Ct. App. 1996).  "'The efforts required to maintain secrecy are those reasonable under the circumstances, and courts do not require extreme and unduly expensive procedures to be taken to protect trade secrets.' " *Sheets v. Yamaha Motors Corp., U.S.A.*, 849 F.2d 179, 183 (5th Cir. 1988) (quoting *Tubular*

29

*Threading, Inc. v. Scandaliato*, 443 So.2d 712, 714 (La. Ct. App. 1983)).

CheckPoint contends that it has presented uncontroverted facts that its drawings contain specifications that are not generally known and would provide economic value if disclosed and used by someone else. Defendants do not dispute the economic value of CheckPoint's drawings but argue that CheckPoint's drawings and CNC code are not trade secrets or, at the very least, questions of material fact remain, since 1) CheckPoint's information was readily ascertainable, 2) CheckPoint did not adequately protect its drawings, and 3) the CNC code was created by Dyn-O-Mach and therefore does not belong to CheckPoint.

1. <u>Ascertainability of CheckPoint's design details</u>

Defendants first claim that CheckPoint's drawings were readily ascertainable because the pumps were available for public purchase, were no longer patented, and could be reverse engineered. That the pumps are on the open market does not negate trade secret protection, because CheckPoint does not seek to have its pumps declared trade secrets, but rather its detailed design drawings and CNC code. Through a comparison of the patent drawings and CheckPoint's manufacturing drawings, CheckPoint has demonstrated that the drawings included in the patent application are much less detailed than those that CheckPoint seeks to have

declared trade secrets.[56] In his declaration, Elliott stated that
CheckPoint's tolerances, calculations of the permissible
variations from the design drawings, are one such specification
that does not appear on the patent drawings that greatly helps to
create the device.[57] Defendants have put forth no evidence to
suggest that such information has been made publicly available
through the expiration of the patent.

Defendants next challenge the unavailability of CheckPoint's
pump specifications by asserting that because the pumps can be
legally reverse engineered, the specifications cannot be trade
secrets. CheckPoint's motion for summary judgment, seeking to
prevent defendants from claiming reverse engineering as a defense
is discussed below. Here, the issue is not whether defendants in
fact reverse engineered CheckPoint pumps, but whether the fact
that the pumps *could* be legally copied bars trade secret
protection. The Fifth Circuit has stated that "protection will be
accorded to a trade secret holder against disclosure or
unauthorized use gained by improper means, even if others might
have discovered the trade secret by legitimate means." *Reingold
v. Swiftships, Inc.*, 126 F.3d 645, 652 (5th Cir. 1997).
Therefore, that CheckPoint pumps can be reverse engineered does
not bar a trade secret claim, as long as the pumps cannot be

---

[56]   *Compare* R. Doc. 176-2 at 7-10 *and* 176-9 at 32-38.

[57]   R. Doc. 189-11 at 1-2.

31

reverse engineered so quickly as to be "readily ascertainable." La. Rev. Stat. § 51:1431(4).

Defendants have submitted evidence that CheckPoint's designs are indeed readily ascertainable. They cite testimony from a machinist and an expert report, both of which indicate that it would not be difficult to replicate a CheckPoint pump based on the publicly available diagrams.[58]  It is true that Olano testified that Dyn-O-Mach's reverse engineering of CheckPoint pumps took one and a half to two years to complete,[59] but on this record, the Court finds that there are issues of material fact as to whether CheckPoint's design information was "readily ascertainable"[60] through reverse engineering.

2. <u>Secrecy of CheckPoint's information</u>

Defendants also claim that CheckPoint did not take reasonable steps to protect the secrecy of its confidential information. "LUTSA requires a party to take reasonable measures to maintain relative, not absolute, secrecy." *Reingold*, 126 F.3d at 650. CheckPoint has produced evidence that it required employees to sign a confidentiality agreement as a condition of

---

[58]    R. Doc. 187-1 at 4-5; R. Doc. 218-1.

[59]    R. Doc. 160-7 at 49-50.

[60]    Comment (e) to § 51:1431 contrasts a product that can be copied "as soon as it is available on the market" to one in which the reverse engineering is "lengthy and expensive."

employment, password protected certain confidential and
proprietary information, limited access to drawings, labeled its
drawings as confidential, and required confidentiality agreements
before disclosing drawings to other companies.[61] In 1994, for
example, CheckPoint required Olano to sign a non-disclosure
agreement before giving him access to CheckPoint's design
drawings. Although the Court has held that the agreement applied
only to the negotiation stage of CheckPoint's and Dyn-O-Mach's
relationship, not their manufacturing dealings, it is
nevertheless evidence of CheckPoint's steps to protect its
drawings.[62] CheckPoint has not submitted evidence of the scope of
other agreements executed by CheckPoint to protect its drawings.

    In support of their position, defendants point to
CheckPoint's failure to ask for its drawings back from Dyn-O-Mach
and other machine shops that were no longer working for
CheckPoint, CheckPoint's lack of compiled inventory of the
drawings sent to outside companies, and its provision of drawings
to these companies by fax and on non-bond paper, which would not
allow the originals to be distinguished from copies.[63] In
addition, defendants submitted the deposition of CheckPoint's
expert, Harvey Ozbirn, who compared RAM and CheckPoint drawings

---

[61]   R. Doc. 200-8 at 2-3.

[62]   R. Doc. 281.

[63]   R. Doc. 219-2 at 2-5.

provided by Dyn-O-Mach.[64] Ozbirn testified that none of the drawings he examined was locked or password protected in the computer program, a step that would have kept others from modifying the drawings.[65]

Although the standard for protection of trade secrets calls only for reasonable efforts (*see Tubos de Acero de Mexico*, 292 F.3d at 483-85), the Court finds that defendants have raised an issue of material fact on the question of whether CheckPoint's efforts to protect its drawings were sufficient. *See id*. The elements of a trade secret claim are questions of fact and are usually reserved for the fact finder after all evidence has been presented. *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 289 (5th Cir. 1978). "Courts are extremely hesitant to grant summary judgment regarding fact intensive questions and whether one took reasonable steps to protect its trade secrets." *Hoover v. Florida Hydro, Inc.,* No. 07-1100, 2009 WL 2391220, at *3 (E.D. La. July 31, 2009) (stating that while evidence has put forth concerning the adequacy of plaintiff's security efforts, the question must be decided at trial). Further, as CheckPoint has moved for summary judgment, all factual inferences regarding the extent of its security steps will be resolved against it. *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir. 1993).

---

[64]    R. Doc. 236-3.

[65]    *Id.*

34

Accordingly, CheckPoint is not entitled to summary judgment on
the issue of whether it took reasonable steps to protect its
drawings.

   3. CNC Code

   Dyn-O-Mach argues that the CNC code that CheckPoint seeks to
protect belongs to Dyn-O-Mach, and thus it cannot constitute a
CheckPoint trade secret. The Fifth Circuit has held that "the
user of another's trade secret is liable even if he uses it with
modifications or improvements upon it effected by his own
efforts, so long as the substance of the process used by the
actor is derived from the other's secret." *Reingold,* 126 F.3d at
651 (internal citation omitted)(changing shape and pattern of bow
portion of 90 foot hull before using it to form bow of 110 foot
mold did not foreclose finding of misappropriation, but merely
created issue of fact). Here, it is undisputed that the CNC code
converts the specifications of design drawings into a language
readable by the machines producing the parts. That Dyn-O-Mach
created the code and has possession of the computers that contain
it does not mean that the code is not derived from a CheckPoint
product, much in the way Dyn-O-Mach created pump parts for
CheckPoint but does not assert proprietary claims to CheckPoint's
design specifications. Yet because whether CheckPoint's drawings
are trade secrets remains a disputed issue, the Court finds that
questions of material fact necessarily exist as to whether the

35

CNC code is "substantially derived from the trade secret of another". *Id.* Further, even if CheckPoint's drawings are trade secrets, CheckPoint has not demonstrated that it tried to reasonably protect the CNC code. Olano testified that the code was kept on several Dyn-O-Mach computers and would not be seen by customers;[66] but, his testimony does not establish that CheckPoint took any steps to protect the code. Moreover, the Court has found that CheckPoint's written Non-Disclosure Agreement with Dyn-O-Mach did not extend beyond the negotiation phase of the companies' relationship.[67] Given the lack of evidence of CheckPoint's efforts to maintain the secrecy of the CNC code and remaining questions of fact as to whether CheckPoint's drawings are trade secrets, summary judgment on the issue of whether CheckPoint's code is a trade secret is unwarranted.

B.   *Reverse Engineering*

CheckPoint next seeks summary judgment precluding defendants from raising the defense of reverse engineering at trial. CheckPoint claims that 1) reverse engineering is an affirmative defense to a LUTSA claim that defendants have not pleaded and thus have waived, and 2) that no questions of material fact exist as to whether defendants actually produced Monkey Pumps through

---

[66]   R. Doc. 178-9 at 10.

[67]   R. Doc. 281.

reverse engineering. Comment (a) to La. Rev. Stat. § 51:1431 states that a proper means of acquiring information includes:

> Discovery by "reverse engineering", that is, by starting with the known product and working backward to find the method by which it was developed. The acquisition of the known product must of course, also be by a fair and honest means, such as purchase of the item on the open market for reverse engineering to be lawful.

Plaintiff cites two cases characterizing reverse engineering as an affirmative defense. But, one uses only the term "defense", and in the other case, the defendants chose to identify reverse engineering as an affirmative defense. *See Body Support Systems, Inc. v. Blue Ridge Tables, Inc.*, No. 1:96CV161, 1997 WL 560920 (N.D. Miss. Aug. 12, 1997); *Recer v. Kramer*, No. 3:97-CV-1258G, 1998 WL 401594 (N.D. Tex. July 10, 1998). In order to establish that it has a trade secret, CheckPoint must show that the information it seeks to protect is not readily ascertainable by proper means, such as reverse engineering. In any event, even if reverse engineering were an affirmative defense, the requirement under Fed. R. Civ. Pro. 8(c) that affirmative defenses be pleaded is not absolute, as long as an issue is raised in a way that does not "result in unfair surprise." *Allied Chem. Corp. v. Mackay*, 695 F.2d 854, 855-56 (5th Cir. 1983). The issue of reverse engineering has been present in the case from its outset, and

plaintiff can hardly assert unfair surprise.[68] Therefore,
CheckPoint's waiver argument is meritless.

CheckPoint has submitted evidence in support of its claim
that defendants did not create Monkey Pumps through reverse
engineering, including the time period in which Monkey Pumps were
produced. Monkey Pumps went on the market in July 2009,[69] but
Olano estimated that the process of creating all of the Monkey
Pump drawings from pump parts took one and a half to two years.[70]
Guccione testified that he brought the first box of parts to Dyn-
O-Mach sometime after June 2008, but he did not specify the exact
date.[71] CheckPoint also points to admissions by Dyn-O-Mach's
machinist, Myler, that he referred to CheckPoint's drawings[72] and
CNC code[73] when developing Monkey Pumps. On the other hand, Myler
first testified that he did not use CheckPoint drawings,[74] and
CheckPoint has not put forth any evidence that Myler used
specifications on the drawings that were not included on
CheckPoint's patent application drawings, which were publicly

---

[68]    R. Doc. 218-2 at 9 (CheckPoint's first set of
interrogatories to Dyn-O-Mach addressed reverse engineering).

[69]    R. Doc. 176-9 at 49.

[70]    *Id.* at 10-11.

[71]    Guccione Deposition (Exhibit A), p. 145.

[72]    R. Doc. 176-4.

[73]    R. Doc. 176-9 at 84-85.

[74]    *Id.* at 82.

available. Given questions concerning the use of the drawings and the time line for the production of RAM's pumps, such as when Dyn-O-Mach first began its drawings and when the drawings were finally approved, and that the reverse engineering of a pump is a technical process that involves a highly factual inquiry, the Court finds that issues of fact remain as to whether defendants developed Monkey Pumps through reverse engineering. Therefore, CheckPoint is not entitled to summary judgment on this issue.

### C. Breach of Contract Claims

CheckPoint also seeks summary judgment on the issues of whether Guccione breached the Confidentiality Agreement[75] and the Assignment Agreement[76] he signed in 1993. Contract interpretation is the determination of the common intent of the parties. La. Civ. Code art. 2045. The words of a contract must be given their generally prevailing meaning. La. Civ. Code art. 2047. When a contract is clear and explicit, no further interpretation may be made in search of the parties' intent. La. Civ. Code art. 2046. The issue of ambiguity of a contract is a legal question. *Dore Energy Corp. v. Prospective Inv. & Trading Co., Ltd.*, 570 F.3d 219, 225 (5th Cir. 2009) (discussing the principles governing the interpretation of contracts under Louisiana law). If the

---

[75]   R. Doc. 204.

[76]   R. Doc. 199.

contract is not ambiguous, then interpreting it is also a legal issue for the court. *Id.* A court may consider extrinsic evidence as to the parties' intent only if the contract is ambiguous. *See, e.g., Campbell v. Melton*, 817 So.2d 69, 75 (La. 2002).

1. Confidentiality and Non-Competition Agreement

Guccione signed a Confidentiality Agreement as part of EEI's purchase of Cross Pump in 1993. EEI then assigned its rights and obligations to CheckPoint when the CheckPoint limited partnership was formed. Guccione does not dispute the terms of the Confidentiality Agreement, which require him to "treat as confidential any Proprietary Information", later defined to include "drawings [and] specifications" and "customer and vendor lists".[77] Rather, Guccione contends that CheckPoint cannot enforce the Sales Contract as a non-signatory. Guccione's assertion is based on the Sales Contract's provision that while the buyer, EEI, may assign some rights included in the contract, EEI "agrees not to assign or sell any patent or patents outright, nor the Assets *in their entirety*, without prior written consent from [Cross Pump]."[78] Guccione argues that because no evidence of Cross Pump's written consent exists, CheckPoint cannot demonstrate that it was properly assigned EEI's assets, including the right to

---

[77]   R. Doc. 189-6 at 38.

[78]   *Id.*

enforce the Confidentiality Agreement. CheckPoint cites a different section of the Sales Contract in support of its right to enforce the contract, one stating that "the Buyer may form another entity to carry out the terms of this contract, with the provision that the Buyer retains control or, at minimum, a majority of equity interest in said entity."[79] The limited partnership agreement forming CheckPoint demonstrates that EEI maintained a majority interest in the company.[80]

It is true that the authorization to form another entity to carry out the terms of the contract does not necessarily mean that EEI was authorized to transfer all of the Cross Pump assets and patents to the new entity without Cross Pump's consent. But in determining the common intent of the parties, the Court must give the terms a reasonable interpretation that is consistent with the parties' apparent intent. The consent provision and the "new entity" provision appear to be separate ways of ensuring that EEI remained involved in the business purchased from Cross Pump. By creating a new partnership in which it has a 70 percent interest and assigning its Cross Pump assets to it, EEI in essence assigned the rights to itself. Accordingly, the Court finds that, even without the written consent of Cross Pump,

---

[79]    *Id.* at 8.

[80]    *Id.* at 45, 52.

CheckPoint validly obtained the Cross Pump assets from EEI, including the right to enforce the agreements in issue.

Further, to the extent the terms of the contract are ambiguous, the Court may consider extrinsic evidence as to its meaning. *See Campbell*, 817 So.2d at 75. The Court finds compelling that the CheckPoint limited partnership was formed soon after the Sales Contract was executed and that CheckPoint managed the rights and obligations that previously belonged to Cross Pump for over seventeen (17) years without questions arising as to whether CheckPoint had all or only some of Cross Pump's rights. Moreover, Guccione was a limited partner of CheckPoint, and Elliott stated in his declaration that Guccione received offering materials indicating that EEI would transfer the Cross Pump assets to CheckPoint.[81] In fact, Guccione testified as to his understanding that CheckPoint had the rights to Cross Pump's technology.[82] In addition, Cross Pump, and later Guccione through an Assignment Agreement in 2000, received royalties from CheckPoint without raising the issue of CheckPoint's rights to the assets transferred to EEI in the 1993 sale. Therefore, the Court finds that the parties' course of dealing makes clear their intent that EEI could transfer the Cross Pump assets to the CheckPoint limited partnership to carry out the Sales Contract

---

[81]   R. Doc. 194-3 at 3-5.

[82]   Guccione Deposition (Exhibit A), p. 24.

without Cross Pump's written consent, as long as EEI maintained a majority interest in CheckPoint.

As to CheckPoint's right to enforce the Confidentiality Agreement specifically, the parties clearly contemplated that the Confidentiality Agreement would be included in the assigned rights. The Sales Contract affirms that all of its provisions and terms apply to assignees,[83] and the Confidentiality Agreement itself states that it is binding on the signing parties "and their sucessors and assigns."[84] Thus, the Court finds that by the terms of the Sales Contract and Confidentiality Agreement, CheckPoint may enforce the Confidentiality Agreement.

CheckPoint contends that Guccione violated the Confidentiality Agreement by providing CheckPoint's tolerances to Dyn-O-Mach and by using CheckPoint's contacts. CheckPoint's tolerances, as design specifications, and its vendor and customer lists are encompassed within the proprietary information to be protected by the Confidentiality Agreement.[85] The document also states that information is not proprietary if it is "publicly known".[86] The Court has already discussed CheckPoint's efforts to protect its design information, and Elliott in his declaration

---

[83]  R. Doc. 194 at 19.

[84]  R. Doc. 137-5 at 2.

[85]  R. Doc. 137-5 at 1.

[86]  *Id.*

43

stated that CheckPoint's tolerances were not generally known.[87] Defendants have put forth no evidence suggesting otherwise, and therefore no questions of fact exist as to whether CheckPoint's tolerances fall within the information protected by the Confidentiality Agreement.

Nevertheless, questions remain as to whether Guccione provided CheckPoint's tolerances to Dyn-O-Mach during the development of the Monkey Pump. Guccione does not dispute that he told Dyn-O-Mach the tolerances to use on Monkey Pumps. He asserts, however, that the tolerances he provided were based on his general knowledge of tolerances as a machinist.[88] CheckPoint contends that Guccione knew the CheckPoint tolerances and gave them to Dyn-O-Mach, as evidenced by the fact that Monkey Pump tolerances appear to be nearly identical to those of CheckPoint pumps, a statistical improbability had CheckPoint information not been used.[89] As the Court may not weigh evidence or make a determination of truth at the summary judgment stage, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the question of whether Guccione provided CheckPoint tolerances to Dyn-O-Mach must be decided at trial.

---

[87]    R. Doc. 189-11 at 1-2.

[88]    R. Doc. 219-2 at 31.

[89]    R. Doc. 202-4 at 4.

44

Regarding Guccione's use of CheckPoint's customer and vendor information that he compiled in his "black book", CheckPoint has not demonstrated that no questions of material fact exist as to whether the contacts were publicly known. Defendants point to publicly available information identifying the companies interested in highly specialized pumps and suggest that this information is known to individuals in the business of creating pumps.[90] Without more evidence, CheckPoint has not shown that its contacts and their phone numbers were not publicly known and that the Confidentiality Agreement extends to the information in Guccione's black book.

In any event, questions of fact exist as to whether Guccione added the contact information to his black book while at CheckPoint and whether he used it after he left CheckPoint. In his declaration, Elliott described the overlap between CheckPoint's and RAM's customers and vendors.[91] Further, Guccione testified that his black book "could have" contained customer contacts that he developed while at CheckPoint and that he "could have" used those contacts after he left CheckPoint.[92] Nevertheless, Guccione also testified that he maintained the

---

[90]   R. Doc. 219 (Defendants identify two websites naming companies that distribute or sell chemical injection pumps; www.houmavalve.com and www.sidewinderpumps.com).

[91]   R. Doc. 204-15 at 20-22.

[92]   Guccione Deposition (Exhibit A), p. 80.

black book containing customer information when he worked in the pump repair business before he ever worked at CheckPoint.[93] Further, Elliott testified that the repair business that Guccione ran before being hired by CheckPoint had as clients many of CheckPoint's customers.[94] Therefore, questions remain as to whether Guccione compiled the contacts in his book while employed by CheckPoint. In addition, Guccione denied using any contacts developed at CheckPoint to sell Monkey Pumps.[95]  Because CheckPoint has not demonstrated that the contact information in Guccione's book was the property of CheckPoint and questions of fact remain as to Guccione's subsequent use of the information, the Court denies summary judgment on the issue of Guccione's breach of the Confidentiality Agreement.[96]

### 2. Breach of the Assignment Agreement

In addition to the Confidentiality Agreement, CheckPoint contends that Guccione violated the Assignment Agreement that accompanied the 1993 Sales Contract by manufacturing and selling Monkey Pumps. The Assignment Agreement identified several pieces of intellectual property that were being assigned to EEI: two

---

[93]    *Id.*

[94]    R. Doc. 219-2 at 13-14.

[95]    Guccione Deposition (Exhibit A), p. 80.

[96]    In its reply brief, CheckPoint concedes that there are facts in dispute as to Guccione's use of CheckPoint's customer and vendor lists. R. Doc. 245-2 at 2.

patents that had been developed by Cross Pump shareholder,
Anthony Quartana; one patent application for a check valve
invented by Quartana and Guccione; and a draft patent application
for a safety guard invented by Quartana and Guccione.[97] In its
motion, CheckPoint relies on the following language to argue that
Guccione assigned the exclusive right to develop and market pumps
"based on" the Cross Pump 1250 and 2200 model pumps:

> The Inventors [including Guccione] . . . have sold,
> assigned, and transferred, and by these presents do hereby
> sell, assign and transfer unto [EEI] ....
>> Any and all other Intellectual Property it has . . .
>> and the sole, exclusive, and irrevocable worldwide
>> right to develop, manufacture, market, sell, assign,
>> license and/or distribute products, patents, and/or
>> designs referred to or **based on** Section 2 of the Sales
>> Contract"[98]. (emphasis added)

Section 2 of the Sales Contract lists the two patents described
in the Assignment Agreement, the pending patent application, and
the draft application, as well as Cross Pump's designs and
products, including Chemical Injection Pumps CP-1250 and CP-
2200.[99] Guccione signed the Assignment Agreement individually as
an inventor and on behalf of Cross Pump.[100] As has been discussed,

---

[97]    R. Doc. 160-2 at 20-21.

[98]    *Id.* at 25; 26.

[99]    R. Doc. 137-4 at 2.

[100]   R. Doc. 160-2 at 29.

EEI then assigned the rights outlined in the Sales Contract to CheckPoint.[101]

CheckPoint contends that Monkey Pumps are "based on" the two pumps described in the Sales Contract, which have evolved into CheckPoint's Series 1250 and 1500 pumps. Thus, CheckPoint argues that Guccione is barred from even reverse engineering CheckPoint pumps, since he assigned his rights to develop a product "based on" the products listed in Section 2. Guccione contends that his ability to compete with CheckPoint is governed by the Confidentiality Agreement, because the scope of the Assignment Agreement is limited to specific patents for component parts, which have expired.

The Court finds that CheckPoint has not demonstrated that no issues of fact exist as to the rights Guccione assigned to EEI in the Assignment Agreement. The Court has previously held that the term "based on" is vague and ambiguous, particularly in light of the language of the contemporaneous non-competition agreement.[102] Accordingly, it held that evidence of the parties' intent could

---

[101]    Guccione reiterates his argument that CheckPoint cannot enforce the 1993 agreements as it was not a party; however, for the same reasons that the Sales Agreement allowed EEI to assign the rights that include the Confidentiality Agreement, CheckPoint may enforce the Assignment Agreement.

[102]    R. Doc. 275.

be introduced at trial to clarify the meaning of the term "based on".[103] This issue remains to be resolved.

Further, the Assignment Agreement demonstrates that the two patents referred to in Section 2 of the Sales Contract belonged initially to Quartana, not Guccione. Quartana had already assigned one patent to Cross Pump in September 1992,[104] and he transferred the other to EEI through the Assignment Agreement.[105] In addition, Guccione and Quartana had already transferred their rights to the check valve patent application to Cross Pump in 1992.[106] The only identified intellectual property that Guccione still had a personal interest in at the date of the assignment was a draft patent application for a safety guard he owned with Quartana.[107] The assignment reflects that the inventors transferred the draft application to EEI.[108] It follows that for CheckPoint to demonstrate that Guccione breached an agreement to assign to EEI the "sole, exclusive, and irrevocable worldwide right to develop, manufacture . . products, patents, and/or designs referred to or **based on** Section 2 of the Sales

---

[103]   *Id.*

[104]   R. Doc. 160-2 at 20; 31.-32

[105]   *Id.* at 25.

[106]   *Id.* at 20; 34-35.

[107]   *Id.* at 21.

[108]   *Id.* at 25.

Contract"[109] (emphasis added), CheckPoint must show that Guccione owned rights within this paragraph in 1993 and that he transferred them to EEI. The only invention, design, or product that Guccione had a personal interest in at the time of the assignment was the safety guard patent application. CheckPoint has produced no evidence that RAM's Monkey Pumps are "based on" the safety guard.

Nor has CheckPoint shown that at the time of the sale, Guccione possessed any other rights to the material listed in Section 2 of the Sales Contract that he could have transferred. Specifically, CheckPoint has not shown that Guccione, an *employee* of Cross Pump, had any independent right to make products based on his *employer's* patented products. Absent such a showing, CheckPoint has not demonstrated that it is entitled to summary judgment on the grounds that Guccione breached the Assignment Agreement by reverse engineering in 2008 or 2009 a pump "based on" the Cross Pump products that became CheckPoint's. Accordingly, summary judgment on Checkpoint's claims for breach of contract is denied.

## V. Conclusion

For the foregoing reasons, the Court GRANTS in part defendants' motions for partial summary judgment, DENIES in

---

[109]   R. Doc. 160-2 at 26.

part defendants' motions for partial summary judgment, and

DENIES plaintiff's motions for partial summary judgment.

New Orleans, Louisiana, this 22nd day of August 2012.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE